Ahilan Arulanantham (*pro hac vice*)
aarulanantham@aclusocal.org
Mohammad Tajsar (*pro hac vice*)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

*Counsel for Plaintiffs*
*(Additional counsel listed on next page)*

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF ARIZONA

| | |
|---|---|
| Ana Adlerstein; Jeff Valenzuela, and Alex Mensing;<br><br>    *Plaintiffs*,<br>v.<br><br>United States Customs and Border Protection; Mark Morgan; United States Immigrations and Customs Enforcement; Matthew Albence; Federal Bureau of Investigation; and Christopher Wray;<br><br>    *Defendants* | CASE NO: 19-cv-00500-CKJ<br><br>**PLAINTIFFS' SEPARATE STATEMENT OF FACTS AND RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**<br><br>[Filed concurrently with Declaration of Ana Adlerstein] |

Christine K. Wee (SBN 028535)
ACLU Foundation of Arizona
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

R. Alexander Pilmer (*pro hac vice*)
Alexander.pilmer@kirkland.com
Kirkland & Ellis LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8405
Facsimile: (213) 680-8500

Plaintiffs submit this Separate Statement of Facts pursuant to Local Rule 56.1(b). This Statement accompanies Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and, in the Alternative, Partial Motion for Summary Judgment.

The first eight paragraphs below correspond to the eight paragraphs that make up Defendants' Statement of Facts. For ease of reference, Defendants' paragraphs are reproduced in italics in each paragraph, and are followed by Plaintiffs' responses to each. Paragraphs nine to seventy seven contain additional facts introduced by Plaintiffs that further establish a genuine issue of material fact as to Defendants' Partial Motion for Summary Judgment.

**Responses to Defendants' Statement of Facts**

1. *Ana Adlerstein was arrested by Customs and Border Protection Officer (CBPO) Marvin Williams on May 5, 2019, at the Lukeville, Arizona Port of Entry. Exhibit 1, Feb. 10, 2020 Declaration of M. Williams ("Williams Decl.") ¶¶ 2, 6, Attach. Arrest Report at 1.*

Undisputed as to Ms. Adlerstein being placed under arrest at the Lukeville, Arizona Port of Entry.

Regarding the identity of the arresting officer, Plaintiffs lack evidence to admit or dispute this fact, since discovery has not opened in this matter and no officers have been deposed. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

2. *At about 5:25 p.m., CBPO Williams responded to a request for assistance from CBPO James Ndungu, who was at the port's entry gate area. When CBPO Williams arrived at the port entry, he observed two women north of the international boundary. CBPO Ndungu was attempting to speak with one of the women, who was later identified as Zoila Irene Benitez Fajardo, and was attempting to determine her country of citizenship, because it appeared she did not possess any documentation permitting her to*

*enter the United States. Williams Decl. ¶ 3; see also Williams Decl. Attach. A at 4.*

Plaintiffs lack evidence to admit or dispute these facts, since discovery has not opened in this matter, no documents have been exchanged, and no officers have been deposed. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

3. *CBPO Ndungu was having difficulty speaking with the Ms. Benitez, however, because the other woman, who was later identified as Ana Adlerstein, was trying to prevent Ms. Benitez from answering CBPO Ndungu's questions. CBPO Williams also tried to ask Ms. Benitez her country of citizenship, and whether she had any documents permitting her to enter the United States. Ms. Adlerstein tried to speak for Ms. Benitez. CBPO Williams told Ms. Adlerstein that Ms. Benitez needed to respond. Notwithstanding this instruction, Ms. Adlerstein continued to prevent Ms. Benitez from responding to the officers' questions. Williams Decl. ¶ 3; see also Williams Decl. Attach. A at 4.*

Disputed. Ms. Adlerstein did not try to prevent the asylum seeker from speaking with any border officers. Adlerstein Decl. ¶ 15. Nor did Ms. Adlerstein attempt to speak for the asylum seeker. *Id.* Ms. Adlerstein did not observe Officer Ndungu ask the asylum seeker any questions. *Id.* at ¶ 16.

As to the conduct of border officers, and their conversations with the asylum seeker, Plaintiffs lack evidence to admit or dispute these facts. Discovery has not opened in this matter, and no one has been deposed concerning these facts. *See* Tajsar Decl. ¶ 5 (filed in support of Rule 56(d) request).

4. *CBPO Williams then inquired about Ms. Adlerstein's relation to Ms. Benitez. Ms. Adlerstein responded that she was serving as Ms. Benitez's "legal observer," and was accompanying Ms. Benitez to help her cross the border into the United States. CBPO Williams responded by asking Ms. Adlerstein why she was assisting a person without the proper legal documentation in entering the United States. Ms.*

1  *Adlerstein answered, "That is what I do." Ms. Adlerstein also stated that she was aware*
2  *that Ms. Benitez did not have any documents permitting her to legally enter the United*
3  *States at that time. Williams Decl. ¶ 4; see also Williams Decl. Attach. A at 4.*

4     Disputed as to the precise discussion between Ms. Adlerstein and border officers.
5  Ms. Adlerstein recalls that she identified herself as the asylum seeker's friend and legal
6  observer around the time of her arrest, but otherwise disputes the account here. Adlerstein
7  Decl. ¶¶ 15–19. At no point did Ms. Adlerstein state, "This is what I do," in response to a
8  question. *Id.* at ¶ 19.

9     Plaintiffs do not dispute that Ms. Adlerstein was aware that the asylum seeker did
10 not have any documents permitting her to legally enter the United States.

11    As to the statements of border officers, Plaintiffs lack complete evidence to admit
12 or dispute these facts given that no officer has been deposed concerning these facts. *See*
13 Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

14

15    5.    *Based on Ms. Adlerstein's statements, CBPO Williams determined that*
16 *there was probable cause to arrest Ms. Adlerstein for an attempted violation of 8 U.S.C.*
17 *§ 1324. CBPO Williams had established that Ms. Adlerstein was attempting to bring Ms.*
18 *Benitez into the United States despite knowing that Ms. Benitez did not have the proper*
19 *documentation or authorization to enter into the United States. Williams Decl. ¶ 5; see*
20 *also Williams Decl. Attach. A at 4.*

21    Objection to the extent this statement disguises a legal contention as a fact. As set
22 forth in Plaintiffs' Opposition, Plaintiffs dispute the existence of probable cause to arrest
23 Ms. Adlerstein.

24    To the extent this statement concerns information about Officer Williams' legal
25 and factual determinations, Plaintiffs lack evidence to admit or dispute these facts, since
26 discovery has not opened in this matter. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of
27 Rule 56(d) request).

28    Further disputed that Ms. Adlerstein was "attempting to bring" the asylum seeker

into the United States. Ms. Adlerstein acted as an observer of the asylum seeker's interactions with border officers. Adlerstein Decl. ¶¶ 6, 18. The asylum seeker's decision to present an asylum claim was theirs alone. *Id*. at ¶ 8.

      6.    *CBPO Williams informed Ms. Adlerstein that it was illegal to attempt to bring a person without proper documentation and authorization into the United States, and Ms. Adlerstein responded that she wasn't doing anything wrong. CBPO Williams placed Ms. Adlerstein under arrest for a suspected violation of 8 U.S.C. § 1324. Williams Decl. ¶ 6; see also Williams Decl. Attach. A at 4.*

      Disputed to the extent the statement suggests that Ms. Adlerstein was not immediately placed under arrest upon her arrival at the Lukeville Port at 5 p.m. Ms. Adlerstein does not recall speaking with border officers prior to Williams' declaration that she was under arrest. Adlerstein Decl. ¶¶ 15, 17.

      Plaintiffs lack evidence to admit or dispute the remainder of the facts (including the reasons why Ms. Adlerstein was placed under arrest), since discovery has not begun in this matter. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

      7.  *Ms. Adlerstein was processed for her arrest, and fingerprinted. Williams Decl. ¶ 7; see also Williams Decl. Attach. A at 4.*

      Undisputed. Ms. Adlerstein was processed for her arrest and fingerprinted. Regarding the precise details of how the arrest was affected and who conducted the fingerprinting, Plaintiffs lack evidence to admit or dispute those facts since discovery has not begun in this matter. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

      8.    *The officers subsequently informed U.S. Immigration and Customs Enforcement ("ICE") officials of Ms. Adlerstein's arrest. ICE informed the CBP officers that they would not respond to the port, and that a prosecution decision would be deferred pending the results of an investigative interview. Ms. Adlerstein was thereafter*

PLAINTIFFS' SEPARATE STATEMENT
4

*released. She walked back to Mexico about 9:00 p.m. Williams Decl. ¶ 4; see also Williams Decl. Attach. A at 4.*

Undisputed as to Ms. Adlerstein eventually being released and walking back to Mexico thereafter. Adlerstein Decl. ¶ 32.

As to the remainder of the statement, including any conversations or discussions with ICE officials, Plaintiffs lack evidence to admit or dispute the remainder of the facts, since discovery has not begun in this matter. *See* Tajsar Decl. ¶¶ 5–10 (filed in support of Rule 56(d) request).

**Plaintiffs' Additional Facts**

9. Ms. Adlerstein lived and worked in the small border town of Ajo, Arizona and volunteered with other humanitarians working to support immigrants. Adlerstein Decl. ¶ 3.

10. One of the ways Ms. Adlerstein provided humanitarian assistance to immigrants was to accompany asylum seekers to the local United States Port of Entry in Lukeville, Arizona, to ensure that United States border officers properly processed their claims for asylum upon arrival at the Port. Adlerstein Decl. ¶ 3.

11. Ms. Adlerstein began accompanying asylum seekers to the Lukeville Port of Entry on November 27, 2018. Adlerstein Decl. ¶ 4.

12. On that day, Ms. Adlerstein traveled to Lukeville accompanying a Guatemalan man who intended to present himself lawfully at the Port to seek asylum. CBP officials denied the man access to the Port, however, and pushed him back from the border. Adlerstein Decl. ¶ 4.

13. On March 6, 2019, Ms. Adlerstein and a few of her fellow volunteers accompanied a group of sixteen individuals—eight adults and eight children—traveling from Sonoyta to the Lukeville Port to seek asylum. Adlerstein Decl. ¶ 5.

14. When the group arrived at the Port, Ms. Adlerstein witnessed CBP officials physically accost these sixteen individuals, including ripping children from their parents'

arms. Adlerstein Decl. ¶ 5.

15.	In part because of these two experiences, as well as those of others whom she spoke with as part of research into a reporting project, Ms. Adlerstein viewed her role as an observer to be vitally important. Adlerstein Decl. ¶ 6.

16.	From what Ms. Adlerstein learned and read at the time, it was unlawful for border officers to refuse to process individuals who arrived at a port of entry to seek asylum. Adlerstein Decl. ¶ 6.

17.	Ms. Adlerstein was also concerned that the kind of violence that she witnessed on March 6 would not be documented if people like herself were not present to observe proceedings. Adlerstein Decl. ¶ 6.

18.	Based on the above, Ms. Adlerstein planned to accompany an asylum seeker from Honduras to the Lukeville Port of Entry on May 5, 2019. Four days earlier, this individual had presented in Lukeville, but CBP officials turned them away. Adlerstein Decl. ¶ 7.

19.	Ms. Adlerstein planned to accompany the asylum seeker to the Port on May 5 to ensure they were not turned away again. For further assurances, she arranged for the individual's immigration lawyer to contact Lukeville officials in advance and inform them that his client intended to arrive at the Port later that day. Adlerstein Decl. ¶ 7.

20.	It is Ms. Adlerstein's understanding that the lawyer did in fact contact Lukeville officials in advance to alert them to his client's impending arrival that day. Adlerstein Decl. ¶ 7.

21.	Ms. Adlerstein did not encourage the asylum seeker to present themselves at Lukeville. The decision to present an asylum claim was the asylum seeker's alone. Adlerstein Decl. ¶ 8.

22.	That afternoon, at around 3 p.m., the asylum seeker approached the Lukeville Port of Entry alone. Ms. Adlerstein stood some distance from the Port on the Mexican side of the border, and observed CBP officials not letting the asylum seeker in. Adlerstein Decl. ¶ 9.

23. Ms. Adlerstein then approached the Port and asked the border officials to clarify that the asylum seeker would not be turned away. A CBP officer named Noriega apologized and said, "We're processing another family," and asked if Ms. Adlerstein and the asylum seeker could return in a couple of hours. They agreed. Adlerstein Decl. ¶ 9.

24. Consistent with this instruction, the asylum seeker returned to the Port at 5 p.m., with Ms. Adlerstein following a few paces behind on the Mexican side of the border. Adlerstein Decl. ¶ 10.

25. Ms. Adlerstein said hello to one of the officers who was present there, whose name is James Ndungu. Officer Ndungu did not respond to her as he had before. Adlerstein Decl. ¶ 10.

26. Instead, Officer Ndungu immediately called for a supervisor on his radio. Adlerstein Decl. ¶ 10.

27. A supervisory CBP officer that Ms. Adlerstein now knows is named Marvin Williams then stormed out of the Port and yelled, "How many?" in her direction. Ndungu held up one finger. Williams responded, "Ok! One asylum-seeker, and an illegal alien smuggler," referring to Ms. Adlerstein. Adlerstein Decl. ¶ 10.

28. By this point, Ms. Adlerstein was on the American side of the border (demarked by a dotted yellow line on the ground), the same place where she had met the asylum seeker and Noriega two hours earlier. Adlerstein Decl. ¶ 11.

29. Ms. Adlerstein did not intend to cross with the asylum seeker into the United States, but was forced to when she was subsequently arrested. Adlerstein Decl. ¶ 11.

30. Officer Williams walked Ms. Adlerstein and the asylum seeker to an office inside the Port, repeatedly calling her an "illegal alien smuggler." Adlerstein Decl. ¶ 12.

31. At one point Officer Williams said, "You know, I could arrest you for this," and then later repeated, "I'm going to arrest you for this." Adlerstein Decl. ¶ 12.

32. In response to these threats and concerned for her safety, Ms. Adlerstein asked, "Am I under arrest?" Williams responded, "Yes." Confused, she again asked

whether she was under arrest. Officer Williams again responded, "Yes." Adlerstein Decl. ¶ 13.

33. Ms. Adlerstein was confused by this arrest, as they had made arrangements with officers in the same office to come back at this time to allow her to observe the asylum seeker being taken in to be processed. She also knew that the asylum seeker's lawyer had called in advance to ensure that the asylum seeker would be processed. Adlerstein Decl. ¶ 14.

34. At this point, Ms. Adlerstein had not interfered at all in the asylum seeker's attempts to be processed by border officials. Adlerstein Decl. ¶ 15.

35. Ms. Adlerstein had not attempted to prevent the asylum seeker from speaking with any border officials, including Officer Ndungu. Adlerstein Decl. ¶ 15.

36. Ms. Adlerstein never attempted to speak for the asylum seeker. Adlerstein Decl. ¶ 15.

37. Ms. Adlerstein did not observe anybody asking any questions directly of the asylum seeker before she was arrested. Adlerstein Decl. ¶ 16.

38. When Officer Williams informed Ms. Adlerstein that she was under arrest, Ms. Adlerstein does not recall speaking with Officer Ndungu or Noriega. Adlerstein Decl. ¶ 17.

39. Ms. Adlerstein recalls that she identified herself as the asylum seeker's friend and legal observer at around the time she was informed that she was being arrested. Adlerstein Decl. ¶ 18.

40. Ms. Adlerstein does not recall stating, "This is what I do" in response to a question from Officer Williams about why she was observing the asylum seeker. Adlerstein Decl. ¶ 19.

41. Once Officer Williams informed Ms. Adlerstein that she was under arrest, Ms. Adlerstein became very confused and fearful about what was happening. Believing she would be interrogated, Ms. Adlerstein informed Officer Williams that she wished to speak to her lawyer. She showed the CBP officials a letter written on her behalf from

Mohammad Tajsar, her lawyer from the American Civil Liberties Union Foundation of Southern California. The letter stated that Mr. Tajsar represented Ms. Adlerstein for purposes of her travel back into the United States from Mexico; that she, as a United States citizen, is entitled to return to the United States as a matter of law; and that she would refuse to answer any questions beyond those necessary to identify her as a citizen. Adlerstein Decl. ¶ 20.

42. Officer Williams took the letter, but did not read it. Instead, he tossed it on a nearby desk and said, "Tell your lawyer to come down here. We'll arrest him too." Adlerstein Decl. ¶ 21.

43. Border officials then took Ms. Adlerstein to a small concrete cell. It had one toilet and one sink, a long bench, and four walls. Adlerstein Decl. ¶ 22.

44. A female officer appeared and searched Ms. Adlerstein's person by spreading her legs, patting her down, and inspecting her body (including under the wiring of her bra). Adlerstein Decl. ¶ 22.

45. The officer offered Ms. Adlerstein a glass of water and a thermal blanket. Ms. Adlerstein accepted both and sat down in the cell. Adlerstein Decl. ¶ 22.

46. Later, another official arrived to fingerprint Ms. Adlerstein, ask her questions, and to fill out some forms. Ms. Adlerstein continued to insist on a conversation with her lawyer throughout her processing, and resisted providing her address to this official. Adlerstein Decl. ¶ 23.

47. Hearing that Ms. Adlerstein refused to provide her address, another official appeared at her cell and asked her to provide her address so that, "You can get out of here." This official informed her that, "We can't hold you for more than eight hours, but we can hold you for up to eight hours." Adlerstein Decl. ¶ 23.

48. Ms. Adlerstein then provided her permanent address because she believed her failure to do so would result in an even more prolonged detention. Lukeville is not a 24-hour Port of Entry, and she feared failing to provide her address would force her to spend the night in the Ajo processing facility. Adlerstein Decl. ¶ 23.

49. While Ms. Adlerstein was arrested and locked away in her cell, CBP officers denied her requests to make any telephone calls. Adlerstein Decl. ¶ 24.

50. After being detained for three hours, one of the officers did contact Ms. Adlerstein's mother to inform her that her daughter had been arrested, but refused to allow Ms. Adlerstein to speak directly to her mother. Adlerstein Decl. ¶ 24.

51. Throughout her detention, various officers at numerous times accused Ms. Adlerstein of "smuggling illegal aliens." Adlerstein Decl. ¶ 25.

52. Ms. Adlerstein recalls telling various officers that she had done nothing wrong. As far as she knew, there is nothing illegal about an asylum seeker arriving at a port of entry to present an asylum claim, and certainly nothing illegal with an individual like herself being nearby to observe. Adlerstein Decl. ¶ 26.

53. As the hours went by, Ms. Adlerstein became increasingly concerned for her wellbeing. The cell was cold, she was barefoot, and the headache which she entered her cell with began to intensify. Adlerstein Decl. ¶ 27.

54. By around 9 p.m., four hours into her detention and with no end in sight, Ms. Adlerstein began banging on the doors of the cell and yelling. An officer appeared at the cell door and asked, "What do you want?" Ms. Adlerstein responded by asking, "Why are you detaining me?" The officer responded, "There is an ongoing investigation, it won't take long." Adlerstein Decl. ¶ 28.

55. Ms. Adlerstein asked the officer, "How long can you detain me?" He replied, "Indefinitely." Adlerstein Decl. ¶ 29.

56. Ms. Adlerstein again asked if she could speak with her lawyer. He responded, "No, because there aren't any charges yet." Adlerstein Decl. ¶ 30.

57. As Ms. Adlerstein became increasingly concerned and upset, she told a border officer that he and his colleagues were violating her rights and detaining her for far too long. Adlerstein Decl. ¶ 31.

58. The border officer to whom she complained dismissed her, stating, "The Fourth Amendment doesn't apply here." Adlerstein Decl. ¶ 31.

59. Multiple border officials repeated the phrase, "The Fourth Amendment doesn't apply here" to Ms. Adlerstein during her detention. Adlerstein Decl. ¶ 31.

60. Ms. Adlerstein eventually demanded the officers call her an ambulance, as her headache had become unbearable. In response, an officer ultimately took Ms. Adlerstein out of the cell and brought her into the nearby office. Adlerstein Decl. ¶ 32.

61. There, officers informed Ms. Adlerstein that they could release her but that she needed to give them her contact information. At that time, a CBP officer told Ms. Adlerstein that there is an ongoing investigation of her, and that, "HSI wants to do a deferred interview." Adlerstein Decl. ¶ 32.

62. Understanding that she would not be released without disclosing her contact information, Ms. Adlerstein finally provided it against her will. The officers then released her. Adlerstein Decl. ¶ 32.

63. Approximately ten days later, an HSI official, James Mike Stanton, contacted Ms. Adlerstein by telephone and asked to speak with her regarding her experience. Ms. Adlerstein never ended up speaking with him. Adlerstein Decl. ¶ 33.

64. Because of her May 5 arrest, Ms. Adlerstein stopped accompanying individuals at Lukeville, and dramatically cut her lawful volunteer work in Sonoyta, as she is scared to continue her work on behalf of asylum seekers. Adlerstein Decl. ¶ 34.

65. Ms. Adlerstein fears that the government will continue to arrest her at the border, particularly if she were to accompany migrants. Adlerstein Decl. ¶ 34.

66. Ms. Adlerstein's fear prevented her from volunteering at the border. Adlerstein Decl. ¶ 35.

67. Despite planning on doing so in the future, Ms. Adlerstein stopped observing migrants who wished to present asylum claims at the Lukeville Port of Entry, fearing that border officers would arrest her again. Adlerstein Decl. ¶ 35.

68. Shortly after Ms. Adlerstein's arrest, management at a Sonoyta-based migrant shelter informed Ms. Adlerstein that a woman and her child had arrived at the shelter and had planned on presenting themselves at the Lukeville Port to seek asylum.

Adlerstein Decl. ¶ 35.

69. Shelter management asked if Ms. Adlerstein would observe the woman and her child presenting themselves at the border. In large part due to her arrest, Ms. Adlerstein refused, and informed management that she felt unsafe accompanying the woman given her recent arrest. Adlerstein Decl. ¶ 35.

70. Ms. Adlerstein's arrest also prevented her from creating an asylum clinic based out of Sonoyta, a project she had been working on for months prior to her arrest. Adlerstein Decl. ¶ 36.

71. In conjunction with immigration lawyers with whom she had been communicating, Ms. Adlerstein developed a program that would connect asylum seekers with lawyers who could provide legal advice to migrants who sought it, and that would facilitate the observation of asylum seekers presenting asylum claims at Lukeville. Among other tasks, Ms. Adlerstein planned on interfacing directly with Lukeville border officers to develop the safest and most efficient process for asylum seekers to present themselves at the Port. Adlerstein Decl. ¶ 36.

72. After Ms. Adlerstein was released from her cell and preparing to leave the Port, she discussed with the supervisory officer Rory Smith her intention to meet with Port staff to discuss the best method for individuals to present themselves at the Port to claim asylum. Adlerstein Decl. ¶ 37.

73. Officer Smith confirmed that he would be interested in meeting with Ms. Adlerstein to discuss the issue further. Adlerstein Decl. ¶ 37.

74. Ms. Adlerstein also planned on becoming a program director for this new clinic. However, following her arrest, these plans collapsed. Adlerstein Decl. ¶ 38.

75. Ms. Adlerstein could not ensure the safety of herself or others who might accompany asylum seekers to the Port, and felt that the government's hostility to humanitarian volunteers made the formation of this clinic impossible. Adlerstein Decl. ¶ 38.

76. Ms. Adlerstein has never been arrested or convicted of any crime.

Adlerstein Decl. ¶ 39.

77. Ms. Adlerstein has never smuggled or trafficked migrants across the U.S.-Mexico border, or directed or knowingly assisted, encouraged, induced, or brought any migrants to enter the United States without authorization. Adlerstein Decl. ¶ 39.

DATED: March 11, 2020

Respectfully submitted,

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

ACLU FOUNDATION OF ARIZONA

KIRKLAND & ELLIS LLP

By: s/ *Mohammad Tajsar*
Mohammad Tajsar
Counsel for Plaintiffs