1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8  Ana Adlerstein, et al.,                    )
                                              )
9              Plaintiffs,                     )
                                              )          No. CIV 19-500-TUC-CKJ
10  vs.                                        )
                                              )               **ORDER**
11  United States Customs and Border           )
   Protection, et al.,                         )
12                                             )
               Defendants.                     )
13  _____)

14         Pending before the Court is the Motion to Dismiss For Lack of Jurisdiction and

15  Failure to State A Claim and, in the Alternative, Partial Motion for Summary Judgment (Doc.

16  16) ("MTD") filed by Defendants United States Customs and Border Protection ("CBP");

17  Mark Morgan, in his official capacity as Acting Commissioner of CBP; United States

18  Immigration and Customs Enforcement ("ICE"); Matthew Albence, in his official capacity

19  as acting director of ICE; Federal Bureau Of Investigation ("FBI"); and Christopher Wray,

20  in his official capacity as director of the FBI ("collectively, "Defendants").  Oral argument

21  was presented to the Court on August 4, 2020.

22

23  I. *Procedural Background*

24         Plaintiffs filed a civil rights Complaint on October 16, 2019.[1]  The Complaint alleges

25  claims for Count I:  Violation of the Fourth Amendment; Count II:  Violation of the First

26  Amendment, and; Count III:  Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(1).

27  _____

28         [1]Unless otherwise stated, the facts are taken from the Complaint (Doc. 1).

1    Defendants filed a Motion to Dismiss For Lack of Jurisdiction and Failure to State A

2    Claim and, in the Alternative, Partial Motion for Summary Judgment (Doc. 16) on February

3    10, 2020.  Plaintiffs Ana Adlerstein ("Adlerstein"), Jeff Valenzuela ("Valenzuela"), and Alex

4    Mensing ("Mensing") (collectively, "Plaintiffs") have filed a response (Doc. 19) and

5    Defendants have filed a reply (Doc. 25).

6

7    II. *Factual Background and the Parties*

8        A. *Plaintiff Ana Adlerstein*

9        Adlerstein is a journalist and a humanitarian volunteer.  Compl., ¶ 1.  Her "reporting

10   focuses on international human rights, migration, and refugees."  *Id.* ¶ 10.  "Adlerstein is also

11   a member of the Network on Humanitarian Action, an international academic network

12   created to promote education, training, and research among humanitarian activists."  *Id.* ¶ 12.

13   Adlerstein has worked with immigrant and refugee communities in Mexico, Greece, and the

14   United States, including recently living and working to support immigrants in Ajo, Arizona.

15   *Id.* ¶ 11.  This includes accompanying asylum seekers to the United States Port of Entry

16   ("POE") in Lukeville, Arizona.  *Id.*

17       On March 6, 2019, Adlerstein (and other volunteers) accompanied a group of sixteen

18   individuals, including adults and children, traveling from Sonoyta to the Lukeville POE to

19   seek asylum.  *Id.* ¶ 36.   Later that evening, Adlerstein attempted to cross into the United

20   States at the Lukeville POE.  CBP officials directed her to secondary screening.  *Id.* ¶ 37.

21       On May 5, 2019, Adlerstein planned to accompany a Honduran asylum seeker, who

22   had previously been turned away at the Lukeville POE, to the Lukeville POE in an attempt

23   to ensure the asylum seeker was not turned away again.  *Id.* ¶ 38.  When the asylum seeker

24   was denied entry, Adlerstein approached the POE and asked border officials why the asylum

25   seeker was denied entry, a "CBP officer apologized and said, 'We're processing another

26   family,' and asked if [] Adlerstein and the asylum seeker could return in a couple of hours."

27   *Id.* ¶ 39.  The asylum seeker returned to the POE at 5:00 p.m., with Adlerstein following

28

some distance behind on the Mexican side of the border. *Id.* ¶ 40. Supervisory CBP Officer Williams "stormed" out of the POE and "yelled, 'How many?' in Adlerstein's direction. Another CBP officer standing outside the port building held up one finger. Williams responded, 'Ok!   One asylum-seeker, and an illegal alien smuggler,' referring to [] Adlerstein." *Id.* Adlerstein did not intend to cross with the asylum seeker into the United States. *Id.* ¶ 41. Adlerstein was arrested. *Id.*

Adlerstein informed Officer Williams that she wished to speak with her attorney and provided CBP officials with a document from her attorney, which stated *inter alia*, that Adlerstein would refuse to any answer questions other than those necessary to identify her as a United States citizen. *Id.* ¶ 44. Although Officer Williams took the letter, he did not read it but threw it on a nearby desk and stated, "'Tell your lawyer to come down here. We'll arrest him too.'" *Id.* ¶ 45.

Adlerstein was taken to a cell, searched, and offered water and a thermal blanket. *Id.* ¶ 46. At around 9:00 p.m., Adlerstein started banging on the doors of the cell and yelling. When an officer asked what she wanted:

> Adlerstein responded by asking "Why are you detaining me?" The officer responded, "There is an ongoing investigation, it won't take long." . . . Adlerstein asked the officer, "How long can you detain me?" He replied, "Indefinitely." . . . Adlerstein again asked if she could speak with her lawyer. He responded, "No, because there aren't any charges yet." . . . As [] Adlerstein became increasingly concerned and upset, she told the officer that he and his colleagues were violating her rights and detaining her for far too long. He dismissed her complaints, stating, "The Fourth Amendment doesn't apply here." Multiple border officials repeated this same phrase to [] Adlerstein during her detention.

*Id.* ¶¶ 51-54.

Although Adlerstein demanded the officers call her an ambulance for an increasingly unbearable headache, officers simply transferred her into a nearby office. *Id.* ¶ 55. Adlerstein was informed that she could be released, but she needed to give them her contact information for a deferred interview. *Id.* She was also informed that she was being held because the investigation was ongoing. *Id.* After "Adlerstein, understanding that she would not be released without disclosing her contact information, finally provided [the contact

information] against her will[,]" Adlerstein was released.  *Id.*

When Adlerstein was contacted approximately ten days later, her attorney requested any questions by the Homeland Security Investigations ("HSI") official be in writing.  *Id.* ¶ 56.  Written questions were not submitted to Adlerstein.  *Id.*

On May 9, 2019, and May 11, 2019, Adlerstein, while driving her own car, traveled to Mexico.  *Id.* ¶ 57.  She did not observe or accompany any asylum seekers on these dates. *Id.*  However, Adlerstein was stopped at the border by U.S. border officials.  *Id.*  During both occasions, Adlerstein was referred to secondary, her vehicle was searched, and each encounter lasted approximately 15 minutes,  *Id.*  On another occasion following the May 5, 2019, incident, Adlerstein, while driving a friend's vehicle, traveled to Mexico.  *Id.*  She did not observe or accompany any asylum seekers.  *Id.*  Upon her return, Adlerstein was let through the border without incident.  *Id.*

Because of the May 5, 2019, incident, Adlerstein stopped accompanying individuals at the Lukeville POE, reduced her volunteer work in Sonoyta, and is scared to continue her work on behalf of asylum seekers because she fears Defendants will continue to subject her to detention and arrest at the border, and has turned down at least one request to observe individuals presenting themselves at the border.  *Id.* ¶¶ 58, 59.  The incident has also prevented Adlerstein from creating and becoming a programming director for an asylum clinic based out of Sonoyta.  *Id.* ¶¶ 60, 61.

On October 9, 2019, Adlerstein submitted letters to the FBI, CBP, and ICE requesting records collected and maintained by the agencies as part of their border surveillance and policing programs be "expunged or amended" to omit all references to her, identifying characteristics, and/or her First Amendment protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2). *Id.* ¶ 173.  The Complaint alleges that, as of the filing date of the Complaint, none of the agencies  responded to "Adlerstein's requests or amended or expunged any records about her."  *Id.*

B. *Plaintiff Jeff Valenzuela*

Valenzuela is a United States citizen who currently resides in Tijuana, Mexico. Compl., ¶ 15.  He is a photographer and a humanitarian, teacher, and a member of a human rights defender organization, Pueblo Sin Fronteras ("PSF"), which provides humanitarian assistance to migrants.  *Id.* ¶¶ 4, 14.  Historically, Valenzuela provided humanitarian assistance to migrants in Tijuana who had arrived in the city after traveling through Mexico and helped establish a migrant shelter at the Benito Juarez sport complex. *Id.* ¶ 68, 69.  He has volunteered with PSF since the middle of 2018. *Id.* ¶ 68.

Prior to July 2018 (when Valenzuela began the majority of his volunteer work with migrants in Mexico), he had only been referred to secondary inspection once.  *Id.* ¶ 70.  In December 2018 and January 2019, Valenzuela was referred to secondary screening on six occasions when he attempted to cross the international border.

On December 26, 2018, Valenzuela entered into the United States via the PedWest pedestrian port within the larger San Ysidro POE.  *Id.* ¶ 71.  After Valenzuela presented his passport, he was referred to secondary screening.  *Id.*  A CBP officer then instructed Valenzuela to leave his wallet and telephone in the room.  *Id.*  After about two hours, two presumed HSI officers escorted Valenzuela into an interview room.  *Id.* 72.  The officers questioned Valenzuela about himself, his work, the caravan generally, and the condition of migrant shelters in Tijuana.  *Id.*  at ¶¶ 72, 73, 75.  When asked if he was part of an organization, Valenzuela responded that he volunteered with several different organizations. *Id.* ¶ 74.  Upon request, Valenzuela reluctantly identified the organizations.  *Id.*  The questioning lasted approximately 15 minutes.

One of the officials then retrieved Valenzuela's phone.  The officials:

> informed [] Valenzuela that they needed to review the contents of his telephone, saying, "It's standard procedure to make sure you don't have child pornography." They demanded he show them his phone's contents, and informed him that his refusal would result in its confiscation and delivery to a second location.  They told him that he risked having his phone unlocked at this second location if he did not comply. . . Fearing that he had no other choice, and not wanting to lose his mobile phone indefinitely, []Valenzuela did as instructed.  He allowed the officials to scroll through

1
2
> photographs on his telephone. The official perusing his phone periodically stopped and asked questions about his photographs, wanting to know details about the pictures.

3   *Id.* ¶¶ at 77, 78.  After being held for approximately two and one-half hours, Valenzuela was

4   released.  *Id.* ¶ 79.

5         On December 28, 2018, Valenzuela attempted to drive across the border from Mexico

6   into the United States.  *Id.* ¶ 80.   Valenzuela was immediately referred to secondary

7   inspection where two officers approached the vehicle.   *Id.* ¶ 81.   The officers asked

8   Valenzuela to exit the vehicle and demanded he place his hands behind his back; Valenzuela

9   was then handcuffed and advised this was standard procedure.  *Id.* ¶ 81.  Valenzuela was led

10   to a windowless booking room where the handcuffs were removed and Valenzuela was

11   searched.  *Id.* ¶ 82.  CBP agents removed Valenzuela's belongings, including his wallet and

12   telephone.  *Id.*  Valenzuela was seated on a bench with his ankles shackled to the bench's

13   steel legs.  *Id.* ¶ 83.  Except for two brief visits to a nearby restroom, Valenzuela remained

14   chained to the bench for approximately four hours.  *Id.*

15         Two other officers then removed the ankle cuffs and escorted Valenzuela into an

16   interview room with a metal table and metal stools.  *Id.* ¶ 84.  Given what Valenzuela

17   perceived to be an intimidating setting and his fear of being chained up again for hours,

18   Valenzuela felt pressured into responding to questioning by the officer.  *Id.* ¶ 86.  The

19   officers interrogated Valenzuela, asking many of the same questions that border officials had

20   asked him on December 26, 2018.  *Id.*  The questions ranged from where Valenzuela lived

21   to what he did for a living and his political beliefs.  *Id.* ¶¶ 87-89.  The questioning lasted

22   approximately 15 minutes.  *Id.* ¶ 90.  Officers then took Valenzuela's phone, which was

23   returned approximately 45-60 minutes later.  *Id.* ¶ 91.  Upon inspection by Valenzuela, he

24   observed that officers had accessed most of the applications on his device, including his

25   email.  *Id.* ¶ 92.  The entire incident lasted approximately five hours.  *Id.* ¶93.

26         On each of the four other occasions when Valenzuela attempted to cross the border,

27   he was referred to secondary inspection.  *Id*. ¶¶ 94-107.  The incidents lasted up to 40

28

minutes long. *Id.*

Valenzuela reduced his humanitarian activity because of the repeated detentions and because he had learned that he was included in a secret watchlist produced by Defendants. *Id.* ¶ 108. Valenzuela "fears that further significant work, including with border organizations, would subject him to repeated, additional scrutiny and arrest at the border, including shackling, arrest, and interrogation. *Id.* As pointed out by the government during oral argument, however, the Complaint does not allege Valenzuela stopped crossing the border from January 2019 through October 2019; i.e., there are no further incidents involving Valenzuela that Plaintiffs seek to present in support of their claims.

On April 3, 2019, Valenzuela submitted letters to the FBI, CBP, and ICE requesting the agencies "disclose" all records they maintained about him in relation to Defendants' surveillance as discussed in the Complaint. *Id.* ¶ 172. Valenzuela also requested the records be "expunged or amended" to omit all references to him, identifying characteristics, and/or his First Amendment-protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2). *Id.* As of the filing date of the Complaint, the agencies did not provide the records to Valenzuela or otherwise respond to his request for expungement. *Id.*

## C. *Plaintiff Alex Mensing*

Mensing has volunteered with PSF since 2014, has worked for immigrants' rights organizations in Dilley, Texas and in San Francisco, California, is a frequent commentator on migration policy issues in North America, and is widely known among civil society groups in the United States and Mexico who work on migrant and refugee rights. Compl., ¶¶ 110, 111. From January 2017 to January 2019 he traveled between Mexico and the United States as often as four times per month. *Id.* ¶ 112.

Defendants initiated an investigation into Mensing that included surveilling his activities and targeting him for repeated seizures, beginning in June 2018. *Id.* ¶ 113. Between June 10, 2018, and October 15, 2019, Mensing entered the United States from

1  Mexico 28 times; during 26 of those entries, Mensing was referred to secondary inspection.

2  *Id.* ¶ 114.  The inspections resulted in interrogation, detention, and physical searches and

3  seizures of his person and belongings.  *Id.*

4        Specifically, between June 10, 2018, and the end of October 2018, Mensing traveled

5  into the United States on June 10, June 11, June 12, July 2, July 23, September 4, September

6  10, September 17, October 1, October 15, and October 23.  *Id.* ¶ 115.  On ten of those

7  occasions, Mensing was referred to secondary inspection.  Each encounter lasted anywhere

8  from 20-40 minutes.  *Id.*

9        On November 11, 2018, Mensing flew into Los Angeles International Airport from

10  Guadalajara, Mexico.  *Id.* ¶ 117.  He was referred to secondary inspection, where he waited

11  approximately 20 minutes, and was then directed to an area for secondary baggage review.

12  *Id.*  While walking towards the baggage review area, an officer asked Mensing about his

13  work with migrants.  *Id.*  Although Mensing did not mention that he worked with asylum

14  seekers, the officer asked Mensing what he did with asylum seekers in Mexico.  *Id.* ¶ 119.

15  "The officer kept pressing [] Mensing on the type of work he did in Mexico, and what

16  exactly he did *with* and *for* the asylum seekers. Mr. Mensing felt increasingly uncomfortable

17  at the questions.  [] Mensing noted that the officer's attitude was aggressive and indicated his

18  disapproval of the questioning."  *Id.*, *emphasis in original*.  At the baggage review area,

19  another officer questioned Mensing.  *Id.* ¶ 120.  This questioning ended with Mensing being

20  asked "whether he recruited migrant workers and whether he worked with marijuana, to

21  which [] Mensing responded 'no' to both."  *Id.* ¶ 121.  Mensing was eventually released.  *Id.*

22        On December 3, 2018, Mensing traveled into San Diego via the San Ysidro POE and

23  was referred to secondary inspection.  *Id.* ¶ 123.  While waiting for someone who officers

24  had informed Mensing needed to speak with Mensing, officers searched Mensing's backpack

25  and pockets; written materials were removed from the backpack and taken into another room.

26  *Id.* ¶ 124.  The items were returned.  *Id.*  After approximately two and one-half hours, two

27  presumed HSI agents arrived and escorted Mensing to a small cell-like concrete room with

28

a secure metal door.  *Id.* ¶ 125.  Mensing was asked about "his work, his education, what his

favorite subject was in university, . . . what his parents' occupations were, . . . [and] his

motivation for volunteering with refugees in Mexico.  She replied to his response that she

considered his perspective to be 'dark.'"  *Id.* ¶ 126.  After about 15 minutes, Mensing's

passport and belongings were returned and he was released.  *Id.*

On December 23, 2018, Mensing traveled by foot into San Diego via the San Ysidro

POE.  *Id.* ¶ 127.  Mensing was instructed to wait approximately 45 minutes before two

presumed HSI agents arrived.  *Id.* ¶ 128.  The agents escorted Mensing to a back room, where

he was forced to empty his pockets and patted down.  *Id.* ¶ 129.  Mensing was then taken to

an interrogation cell where Mensing was interrogated.  *Id.* ¶¶ 129, 130.  After asking many

of the same questions that had been asked of Mensing in prior encounters and detentions, the

officers asked "about [] Mensing's personal finances, seeking details about [] Mensing's

previous jobs, how much money he earned in them, . . . how much he held in savings, . . .

how he supported himself financially while in Mexico . . . , what his favorite parts of school

were, and what subjects he specialized in."  *Id.* ¶¶ 132, 133.  Mensing answered all questions.

*Id.*  One of the officers informed Mensing that he did not think Mensing was a criminal, but

suggested that some people do.  *Id.* ¶ 134.

When the officers asked to see Mensing's phone, Mensing informed them that he did

not bring one with him.  *Id.* ¶ 135.  Additionally,

> The officers finally informed [] Mensing that they were going to search his belongings
> "for drugs."  They did so outside of [] Mensing's presence.  Upon the officers
> returning with his belongings, [] Mensing asked if they had photocopied any of his
> belongings.  [One o]fficer [] looked nervously at [the other], which [] Mensing
> interpreted as an affirmative response.  He told them, "So, yes you did?"  They
> responded by saying, "Just a few documents."  The officers released him shortly
> thereafter.

*Id.* ¶ 136.  The encounter lasted between two to three hours.  *Id.* ¶ 137.

Mensing attempted to enter the United States on January 11 and 18, 2019.  *¶¶* 138-

146.  He was referred to secondary on both those occasions.  *Id.*  After his return to Mexico

and until September 2019, Mensing stopped traveling to the United States because he feared

1   he would subject to continued seizures and questioning and because it had been revealed he
2   and his fellow PSF volunteers were under surveillance.  *Id.* ¶ 147.

3        On September 3, September 12, October 7, October 8, October 10, October 11,
4   October 13, October 14, and October 15, 2019, Mensing traveled to the United States via
5   various POEs  *Id.* ¶¶ 148-152.  Mensing was referred to secondary on each of these
6   occasions.  *Id.*

7        Mensing continues to fear Defendants will detain, arrest, search, and interrogate him
8   every time he crosses into the United States.  *Id.* ¶ 155.

9        On April 3, 2019, Mensing submitted letters to the FBI, CBP, and ICE requesting the
10  agencies "disclose" the records they maintained about him in relation to the surveillance
11  scheme discussed in the Complaint.  *Id.* ¶ 171.  Mensing also requested the records be
12  expunged or amended to omit all references to him, identifying characteristics, and/or his
13  First Amendment-protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and
14  (d)(2).  As of the filing date of the Complaint, the agencies had failed to provide Mensing
15  with the records, or otherwise respond to his request for expungement.  *Id.*

16

17        D.  *Defendants*

18        Plaintiffs allege Defendants closely observe and conduct intrusive seizures of activists
19  across the southwest border states, including Arizona and California.  Compl., ¶ 26.
20  Specifically, as documented in a leaked May 30, 2019, External Intelligence Note ("Note"),
21  which states the FBI tracks border protest groups and labels them as a source of potential
22  violence, despite cited evidence involving nonviolent protest activity.  *Id.*  The sources for
23  the Note are human sources with direct access to the organization from May 2018 through
24  February 2019, as well as "[Department of Homeland Security ("DHS")] open source
25  intelligence collection."  *Id.* ¶ 27.  "DHS open source intelligence collection" refers to the
26  FBI's reliance on ICE and CBP surveillance and intelligence gathering operations.  *Id.*

27        Defendants operated another surveillance program dubbed "Operation Secure Line"
28

1   ("OSL"), a government operation designated to monitor migrant caravans. *Id.* ¶ 28.  The

2   operation began in May 2018 and escalated in December 2018 and January 2019, *id.*, and

3   involved  officers of Defendants CBP, FBI, and ICE surveilling and seizing activists and

4   workers (including Plaintiffs) at the border. *Id.*  A December 1, 2018, email from the Special

5   Agent in Charge of the San Diego HSI office stated that HSI was increasing intelligence

6   collection efforts in response to a migrant caravan. *Id.* ¶ 29.  Agents were instructed to

7   question all available sources of information, document the information, and forward the

8   information to the agency's chief intelligence officer. *Id.*

9       In approximately January 2019,[2] Defendants created a secret database of 59

10  individuals who associated with or otherwise supported migrants seeking asylum in the

11  United States. *Id.* ¶ 30.  Valenzuela and Mensing were included in this list, which also

12  included many United States citizens. *Id.* ¶¶ 30, 65.  "One of the purposes of the list was to

13  memorialize 'who officials think should be targeted for screening at the border' and for

14  further scrutiny, including revocations of travel privileges and international alerts limiting

15  the targets' ability to travel expeditiously." *Id.*, *citation omitted*.  The Defendant agencies

16  jointly manage the list, access the list, and  seize the individuals included therein. *Id.*  CBP

17  has stated that it "may inconvenience law-abiding persons in our efforts to detect, deter, and

18  mitigate threats to our homeland," but defended the program and made clear the agency's

19  intent to continue it. *Id.* ¶ 31.

20      As summarized in the Reply to MTD, the acting DHS secretary issued a May 17,

21  2019, Memorandum ("McAleenan Memo") in which he instituted and directed DHS

22  component agencies to comply with a new policy that:

23      prohibits the collection, maintenance, and use of information protected by the First

24  _____

25  [2]The Complaint alleges this conduct occurred "one month later[,]" referencing the
    December 1, 2018, email. Compl., ¶ 30.  The Court notes the Complaint also states that,

26  "[b]eginning in December 2018, . . . Defendants identified [] Valenzuela as a person of interest,
    began surveilling his activities and his work, and targeted him for intrusive seizures at the

27  border." *Id.* ¶ 70.

28                                          - 11 -

1    Amendment except (among other reasons) as relevant to a criminal, civil, or
     administrative activity relating to a law that DHS administers or enforces. Id. The
2    policy specifically addresses "questions and responses relating to an individual's
     occupation, purpose for international travel, or any merchandise the individual seeks
3    to bring across the border" and their relevance to law enforcement activities at the
     border. Plaintiffs have no basis to allege CBP is ignoring this policy, nor that the
4    policy itself is infirm.

5    Reply, pp. 1-2 (Doc. 25), *citing* McAleenan Memo;[3] *see also* MTD, p. 12, n. 5.

6

7    **IV**. *Motion to Dismiss For Lack of Jurisdiction and Failure to State A Claim and, In the
     Alternative, Partial Motion for Summary Judgment* (Doc. 16)

8
9        Defendants move for dismissal based on the lack of subject matter jurisdiction,

10   Fed.R.Civ.P. 12(b)(1), and the failure state a claim upon which relief may be granted,

11   Fed.R.Civ.P. 16(b)(6).   Alternatively, Defendants seek partial summary judgment.

12   Fed.R.Civ.P. 56.

13

14       **A**. *Subject Matter Jurisdiction*

15       Federal courts are courts of limited jurisdiction which are presumptively without

16   jurisdiction over civil actions. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

17   377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The burden of establishing the contrary rests

18   upon the party asserting jurisdiction. *Id.* Because subject matter jurisdiction involves a

19   court's power to hear a case, it cannot be forfeited or waived. *United States v. Cotton*, 535

20

21       [3]During oral argument, the Court asked Plaintiffs' counsel if Plaintiffs agreed the
     McAleenan Memo could be considered at this stage of the proceedings.  Counsel did not
22   respond to this question.  In other words, Plaintiffs have not asserted the Court may not consider
     the McAleenan Memo at this time.  Additionally, this memorandum is accessible at
23   https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protect
     ed_activities_as1_signed_05.17.2019.pdf (last accessed September 30, 2020).  The Court finds
24   it appropriate to take judicial notice of this memorandum. *Arizona Libertarian Party v. Reagan*,
     798 F.3d 723, 727 (9th Cir. 2015), *citations omitted* (the Court may take judicial notice of
25   "official information posted on a governmental website, the accuracy of which [is] undisputed");
     *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (the court
26   can take judicial notice of "[p]ublic records and government documents available from reliable
     sources on the Internet," such as websites run by governmental agencies), *citations omitted*.
27

28                                          - 12 -

U.S. 625, 630 (2002).  In fact, "courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); Fed.R.Civ.P. 12(h)(3) (requiring the court to dismiss the action if subject matter jurisdiction is lacking).

A motion to dismiss for lack of subject matter jurisdiction may be either a facial attack or a factual attack. *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  However, "in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*.  "Moreover, when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) , *citations omitted*; *see also Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir.1983) (consideration of material outside the pleadings did not convert a Rule 12(b)(1) motion into one for summary judgment); *Safe Air for Everyone*, 373 F.3d at 1039.  Where a factual attack is made "no presumptive truthfulness attaches to plaintiff's allegations." *Thornhill*, 594 F.2d at 733, *internal citation omitted*.


B.  *Requirement that Action State a Claim on Which Relief Can be Granted*

A complaint is to contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a).  A complaint must set forth a set of facts that serves to put defendants on notice as to the nature and basis of the claim(s).  The United States Supreme Court has found that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While a complaint need not plead "detailed factual allegations," the factual

allegations it does include "must be enough to raise a right to relief above the speculative level." *Id.* 555; *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss[.]").  Further, Fed.R.Civ.P. 8(a)(2) requires a showing that a plaintiff is entitled to relief "rather than a blanket assertion" of entitlement to relief. *Twombly*, 127 S.Ct. at 1965 n. 3.  The complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right to action." *Id.* 1965.

The Court considers the Complaint in light of *Twombly* and must determine if Plaintiffs have "nudge[d] [the] claims across the line from conceivable to plausible." *Id.* 570. The Court also considers that the Supreme Court has cited *Twombly* for the traditional proposition that "[s]pecific facts are not necessary [for a pleading that satisfies Rule 8(a)(2)]; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardue*, 551 U.S. 89, 93 (2007).  Indeed, *Twombly* requires "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2nd Cir. 2007); *see also Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009) (for a complaint to survive a motion to dismiss, the non-conclusory "factual content," and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief).

This Court must take as true all allegations of material fact and construe them in the light most favorable to Plaintiffs.  *See Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir.  2003).  In general, a complaint is construed favorably to the pleader.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds*, 457 U.S. 800.  Nonetheless, the Court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

- 14 -

1        If a court determines that dismissal is appropriate, a plaintiff must be given at least

2    one chance to amend a complaint when a more carefully drafted complaint *might* state a

3    claim. *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991).  Moreover, when dismissing with

4    leave to amend, a court is to provide reasons for the dismissal so a plaintiff can make an

5    intelligent decision whether to file an amended complaint. *See Bonanno v. Thomas*, 309 F.2d

6    320 (9th Cir. 1962); *Eldridge v. Block*, 832 F.2d 1132 (9th Cir. 1987).

7

8    V.  *Standing*

9        Defendants argue Plaintiffs lack standing to assert claims for violations of the First

10   and Fourth Amendments based on the request for prospective injunctive relief enjoining

11   Defendants from investigating them, surveilling them, and from screening them at the border.

12   Plaintiffs seek injunctive relief directing Defendants to cease suspicionless detentions,

13   arrests, interrogations, and physical restraints of Plaintiffs at the border for purposes

14   unrelated to the border search exception to the Fourth Amendment and expungement of

15   records.

16       Federal courts are courts of limited jurisdiction, possessing only that power authorized

17   by Article III of the United States Constitution and statutes enacted by Congress. *Bender v.*

18   *Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  Standing is a jurisdictional

19   limitation. It is "an essential and unchanging part of the case-or-controversy requirement of

20   Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  As summarized by

21   another district court:

22       The plaintiff bears the burden of establishing the existence of a justiciable case or
         controversy, and "'must demonstrate standing for each claim he seeks to press' and
23       'for each form of relief' that is sought." *Davis v. Federal Election Comm'n*, 554 U.S.
         724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (quoting *DaimlerChrysler Corp.*
24       *v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)).  "A plaintiff
         must establish standing with the 'manner and degree of evidence required at the
25       successive stages of the litigation.'" *Carrico v. City and County of San Francisco*,
         656 F.3d 1002, 1006 (9th Cir. 2011) (quoting *Lujan*,504 U.S. at 561, 112 S.Ct. 2130).
26       "[A]t the pleading stage, the plaintiff must clearly ... allege facts demonstrating each
         element." *Spokeo, Inc. v. Robins*, — U.S. — , 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635
27       (2016) (internal quotations omitted).

28                                            - 15 -

1    *Arizona Attorneys for Criminal Justice v. Ducey*, 373 F. Supp. 3d 1242, 1246 (D. Ariz.

2    2019).  In other words, the Court must consider standing as to each Plaintiff and for each

3    form of relief requested.

4          A plaintiff seeking injunctive relief must demonstrate that the threatened injury is not

5    "speculative and [must] qualify as 'concrete, particularized, and actual or imminent; fairly

6    traceable to the challenged action; and redressable by a favorable ruling.'" *Or. Prescription*

7    *Drug Monitoring Program v. DEA*, 860 F.3d 1228, 1235 (9th Cir. 2017), *quoting Clapper*

8    *v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).   Further, "[p]ast exposure to harmful or

9    illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff

10   does not continue to suffer adverse effects. Nor does speculation or 'subjective apprehension'

11   about future harm support standing."  *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir.

12   2010), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), and *quoting Friends*

13   *of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000)).

14         The Complaint alleges Adlerstein has stopped accompanying individuals at the

15   Lukeville POE, reduced her volunteer work in Sonoyta, is scared to continue her work on

16   behalf of asylum seekers because she fears Defendants will continue to subject her to

17   detention and arrest at the border, has turned down at least one request to observe individuals

18   presenting themselves at the border, and has ceased plans to create and become a

19   programming director for an asylum clinic based out of Sonoyta.  The Complaint also alleges

20   Valenzuela reduced his humanitarian activity because of the repeated detentions and because

21   he had learned that he was included in a secret watchlist produced by Defendants; he fears

22   additional border work will subject him to repeated, additional scrutiny and arrest at the

23   border.  Mensing did not cross into the United States from January 18, 2019, until September

24   3,  2019, because he feared Defendants would detain, arrest, search, and interrogate him

25   every time he crosses into the United States.  Although he has resumed his crossings into the

26   United States, he continues to have these fears.

27         "The reasonable inference to draw from [the] Complaint is that [Adlerstein] is

28                                                - 16 -

[subject to monitoring under OSL and that Valenzuela and Mensing are] on one or more government watchlists." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 992 (9th Cir. 2012). Further, "it is a reasonable inference that removal of [Plaintiffs' names] from government watchlists would make [entry into the United States less burdensome]." *Id*. However, this fails to factor in the existence of the McAleenan Memo. Moreover, although Plaintiffs argue the policy does not undermine the plausible inferences raised in the Complaint, this argument only addresses whether the Complaint survives a Fed.R.Civ.P. 12(b)(6) challenge, not whether the threatened injury is speculative or if it is concrete, particularized, and actual or imminent.

The possible future conduct at issue in this case is arguably not a threat to Plaintiffs in light of the McAleenan Memo. In other words, it could be said that the possible future conduct is "inapplicable to the [P]laintiffs, either by its terms or as interpreted by the government." *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010). However, the Ninth Circuit, in *Lopez*, did not state that such inapplicability resolved the issue. Rather, it "weighs against" claims that the government will engage in the alleged conduct. The Court considers the policy set forth in the McAleenan Memo, therefore, as a factor weighing against a finding of standing, but not dispositive of the issue.

Additionally, Defendants argue speculation or subjective apprehension about future harm does not support standing to raise a prospective injunctive relief claim. *See Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010), *citations omitted*. Even where a plaintiff has been wronged, that plaintiff is entitled to prospective injunctive relief "only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'" *Munns v. Kerry*, 782 F.3d 402, 411 (9th Cir. 2015), *citation omitted*. For example, also weighing against a finding of standing by Valenzuela is that from January 2019 through the filing of the Complaint in October 2019, no further incidents involving Valenzuela are alleged to have occurred even though the Complaint does not allege Valenzuela stopped crossing the border. This supports Defendants' argument that Plaintiffs are speculating about

- 17 -

future harm.  Further, Defendants point out that the government has broad authority to enforce customs and immigration laws and to examine and search individuals during border crossings.  The chilling effect of the alleged government actions is insufficient to create standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407 (2013).  However, unlike in *Clapper*, Plaintiffs have alleged an injury has already occurred.  The Ninth Circuit has recognized that "Supreme Court cases recognize that such statutorily recognized harms alone may confer standing (without additional resulting harm)[.]" *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017).

Although the policy set forth in the McAleenan Memo weighs against standing, the allegations and inferences in the Complaint regarding past conduct and injuries present a credible threat of future harm.  *Lopez*, 630 F.3d at 786. Plaintiffs have alleged they are "realistically threatened by a repetition of the violation," *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012), *internal alterations omitted*, or have shown a credible threat of future injury, *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).  Dismissal of the prospective injunctive relief claims on this basis is not appropriate.

## VI.  *First Amendment Claims*

The Complaint states Defendants are operating a surveillance operation that has resulted in the investigation and collection of information about journalists, legal workers, and humanitarian workers, including Valenzuela and Mensing, who are associated with migrants traveling through Mexico to seek asylum in the United States.  Compl. ¶¶ 164, 165. Plaintiffs assert Defendants had no justification for "collecting information and maintaining records about [Valenzuela's and Mensing's] First Amendment-protected activities, speech, and associations." *Id*. ¶ 165.  The Complaint further states Defendants violated Adlerstein's "First Amendment right to free association because her associations with the migrants she lawfully accompanied to a port of entry directly caused her prolonged and unjustified arrest." *Id*. ¶ 166.  In their response to the MTD, Plaintiffs describe the First Amendment claims as

being based on allegations that the Government 1) "initiated and continues its secret surveillance and detention program based on Plaintiffs' protected activities and associations; and 2) . . . unlawfully maintains records about their First Amendment-protected activities without justification[,]" and assert they have alleged "a claim for retaliation under the First Amendment." Response, p. 18.

A. *Notice Pleading*

Defendants argue in their MTD that claims regarding the lawfulness of investigations and seizures is considered under the Fourth Amendment. *See United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007); *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). Plaintiffs disagree and assert the First Amendment constrains the government from investigating individuals for retaliatory purposes. *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1219–20 (9th Cir. 2019). The disagreement is based on the parties' lack of agreement as to whether the Complaint states a First Amendment retaliation claim.

Defendants point out the Complaint does not use the word "retaliation" and argue the Complaint insufficiently provides notice of a First Amendment retaliation claim to Defendants. Indeed, the Ninth Circuit has stated:

> The "new" allegations contained in the inmates' opposition motion, however, are irrelevant for Rule 12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. *See Harrell v. United States*, 13 F.3d 232, 236 (7th Cir.1993); *see also 2 Moore's Federal Practice*, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).").

*Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197, n.1 (9th Cir. 1998). However, a plaintiff's briefing may be used "to clarify allegations in [the] complaint whose meaning is unclear." *Pegram v. Herdrich*, 530 US 211, 230, n. 10 (2000); *Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1138 (9th Cir. 2001).

The allegations in a complaint must give a "defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006), *quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). While the Complaint in this case does not use the word retaliation to describe Defendants' conduct, it does state Adlerstein's associations with migrants "directly caused her prolonged and unjustified arrest." Compl. ¶ 166. The Complaint also states that "because Defendants maintain records of Plaintiffs' activities and associations, and target[] them for surveillance based upon these activities and associations, Defendants' practices also violated the First Amendment and related federal law." *Id.* ¶ 6. In other words, the Complaint is describing retaliatory conduct. The response to the MTD is not presenting additional facts or theories that are inconsistent with the conduct described in the Complaint. *See e.g. Hayes v. Whitman*, 264 F3d 1017, 1025 (10th Cir. 2001) (court may not consider additional facts or legal theories in responsive brief that are inconsistent with those pleaded in complaint). As summarized by the Ninth Circuit:

> Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories. *See* Fed.R.Civ.P. 8(a)(2). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*[, 534 U.S. at 512]. A complaint need not identify the statutory or constitutional source of the claim raised in order to survive a motion to dismiss. *See, e.g., Sagana v. Tenorio*, 384 F.3d 731, 736–37 (9th Cir.2004); *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir.2004); *Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir.1992).

*Alvarez v. Hill*, 518 F.3d 1152, 1157–58 (9th Cir. 2008). Although Plaintiffs did not identify their claim using the word retaliation, they stated claims for retaliatory conduct. The Court finds a fair reading of the Complaint states a First Amendment retaliation claim.

**B.** *First Amendment Retaliation Claim*

Because the Court has found the Complaint includes a First Amendment retaliation claim, the claim is reviewed under the First Amendment. The Ninth Circuit has stated:

> To state a First Amendment retaliation claim, a plaintiff must plausibly allege "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the

- 20 -

1
2
3
4
5

defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).  To ultimately "prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, — U.S. — , 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006)).  Specifically, a plaintiff must show that the defendant's retaliatory animus was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id*. (quoting *Hartman*, 547 U.S. at 260, 126 S.Ct. 1695).

6
7

*Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019); *see also Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).

8
9
10
11
12
13
14
15
16
17
18
19
20

Here, Plaintiffs allege each were engaging in the protected activity of associating with migrants and advocates and that Valenzuela and Mensing were engaging in political speech. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (First Amendment protects right to associate with others in pursuit of political, social, economic, educational, religious, and cultural ends); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186–87 (1999) (First Amendment protects core political speech), *citation omitted*.  Although Defendants argue Plaintiffs have failed to allege sufficient specificity (e.g., a particular speech or speaker), ongoing protected activity may be the basis for a First Amendment retaliation claim.  *See e.g., Cruz v. Lee*, No. 14CV4870NSRJCM, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016).  Additionally, the Court finds Plaintiffs have adequately alleged Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity.

21
22
23
24
25
26
27

Further, based on the statements and conduct of the individual officers, along with the McAleenan Memo, the Complaint alleges sufficient facts and inferences that Plaintiffs' protected activity was a substantial or motivating factor in Defendants' conduct.  In other words, the Complaint has sufficiently alleged Defendants would not have engaged in the adverse actions but for the retaliatory motive.  *Nieves*, 139 S. Ct. at 1722.  In fact, Plaintiffs have alleged the retaliatory conduct was relatively close in time to the protected activity and have alleged comments by individual officers inferring opposition to the protected activity.

28

1   *See Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1223 (D. Or. 2017), aff'd, 758 F.

2   App'x 582 (9th Cir. 2018) ("The Ninth Circuit has described three ways in which a plaintiff

3   can show the requisite causal connection for First Amendment retaliation: (1) the proximity

4   in time between the protected conduct and the retaliatory conduct; (2) expressed opposition

5   by the alleged retaliatory actor; or (3) evidence that the proffered explanations are false and

6   pretextual."), *citation omitted*. Plaintiffs have also alleged a pattern of antagonism and

7   ongoing retaliatory conduct following the protected activity. *Porter v. Cal. Dep't Corr.*, 419

8   F.3d 885, 895 (9th Cir. 2005); *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1301 (N.D. Cal.

9   2020); *Adetuyi v. City & Cty. of San Francisco*, 63 F. Supp. 3d 1073, 1090 (N.D. Cal. 2014)

10  ("pattern of ongoing retaliation following protected conduct supports a finding of

11  causation"), *citation omitted*.

12      Further, the Complaint alleges injuries (e.g., surveillance of Plaintiffs, extended border

13  contact for improper purposes, and generating and maintaining records on Plaintiffs) caused

14  by Defendants' conduct. The Court finds Plaintiffs have sufficiently alleged a First

15  Amendment retaliation claim.

16

17  VII. *Fourth Amendment Claims*

18      Plaintiffs' Fourth Amendment claims are based on the May 5, 2019, alleged arrest of

19  Adlerstein, the alleged arrests of Valenzuela between December 2018 and January 2019, and

20  the alleged detentions and interrogations of Mensing between June 10, 2018, and October

21  15, 2019. Response, p. 5, n. 2.[4] Plaintiffs allege these seizures violated the Fourth

22

23

24

25      [4]The Court disagrees with Plaintiffs' assertion Valenzuela's detentions constituted arrests.

26  Rather, the detentions, including the searches of property and cell phones and the handcuffing

27  of a detainee does not necessarily convert a border detention into an arrest. *United States v. Cano*, 934 F.3d 1002, 101 (9th Cir. 2019); *United States v. Nava*, 363 F.3d 942 (9th Cir. 2004).

28                                      - 22 -

1   Amendment.[5]  The parties disagree as to whether the border inspections at issue in this case

2   should be deemed "non-routine."

3          Generally, the Fourth Amendment prohibits warrantless searches without probable

4   cause subject to a few narrow exceptions.  *Morgan v. United States*, 323 F.3d 776, 781 (9th

5   Cir. 2003), *citation omitted*.  One exception is a border search, which permits routine border

6   searches without suspicion and non-routine border searches supported by reasonable

7   suspicion. *United States v. Molina–Tarazon*, 279 F.3d 709, 712 (9th Cir.2002)

8          The Ninth Circuit has stated:

9          The broad contours of the scope of searches at our international borders are rooted in
10         "the long-standing right of the sovereign to protect itself by stopping and examining
           persons and property crossing into this country." [*United States v. Ramsey*, 431 U.S.
           606, 616 (1977)].  Thus, border searches form "a narrow exception to the Fourth
11         Amendment prohibition against warrantless searches without probable cause."
           [*United States v. Seljan*, 547 F.3d 993, 999 (9th Cir.2008) (en banc), *internal*
12         *quotation marks and citation omitted*].  Because "[t]he Government's interest in
           preventing the entry of unwanted persons and effects is at its zenith at the
13         international border," *United States v. Flores–Montano*, 541 U.S. 149, 152 [] (2004),
           border searches are generally deemed "reasonable simply by virtue of the fact that
14         they occur at the border." *Ramsey*, 431 U.S. at 616 [].

15  *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013).

16

17         A.  *Routine and Nonroutine Border Inspections*

18         The Supreme Court has distinguished between "routine" and "nonroutine" searches,

19  holding that only "[r]outine searches of the persons and effects of entrants are not subject to

20  any requirement of reasonable suspicion, probable cause, or warrant."   *United States v.*

21  *Montoya de Hernandez*, 473 U.S. 531, 538 (1985) *citing Ramsey*, 431 U.S. at 618-19).  In

22  *Montoya de Hernandez*, the Supreme Court determined that a nonroutine seizure occurred

23  when the defendant was detained for sixteen hours while border agents obtained a court order

24  to conduct a rectal examination, but nevertheless found the seizure constitutional because it

25

26  _____

27         [5]The Response to the MTD does not argue a Fourth Amendment claim based on any
    search of Plaintiffs or their property.

28                                                    - 23 -

1  was supported by the agents' reasonable suspicion that the defendant was smuggling drugs

2  in her alimentary canal.  473 U.S. at 541.

3          The Ninth Circuit has discussed a non-exhaustive list of factors for the court to

4  consider in determining when a border search converts from a routine to non-routine search,

5  including the use of force, danger to the person whose possessions are being searched, and

6  the psychological intrusiveness of the search.  *See United States v. Bravo*, 295 F.3d 1002,

7  1006 (9th Cir. 2002).  The distinguishing factor between a routine search and a non-routine

8  search is the degree of intrusiveness.  *United States v. Ramon-Saenz*, 36 F.3d 59, 61 (9th Cir.

9  1994) (explaining that strip searches, body cavity searches, and involuntary x-ray searches

10 are all non-routine searches).  A border search goes beyond a routine search "only when it

11 reaches the degree of intrusiveness present in a strip search or body cavity search." *Id*.

12 (concluding that the search of the defendant's shoes did not go beyond routine); *see also*

13 *Bravo*, 295 F.3d at 1006 ("searches involving extended detention or an intrusive search of

14 a person's body are not routine"); *United States v. Duncan*, 693 F.2d 971, 978 (9th Cir. 1982)

15 (concluding that the search of carry-on luggage, pockets, and a wallet, and a superficial

16 pat-down did not involve a serious invasion of personal privacy and dignity).

17         In *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019), the Ninth Circuit stated

18 that "a "highly intrusive" search—such as a forensic cell phone search—requires some level

19 of particularized suspicion."  934 F.3d at 1020.  Here, however, although the Complaint

20 includes facts regarding two searches of Valenzuela's cell phone, the statement of the Fourth

21 Amendment claim indicates it is not based on these searches.  Indeed, the alleged facts do

22 not indicate an invasive forensic search of the cell phone was conducted or that agents "went

23 beyond a verification that the phone lacked digital contraband."  *Id*., at 1019.  As a "manual

24 cursory search of a digital device being brought across an international border" does not

25 require either a warrant or reasonable suspicion, *United States v. Caballero*, 178 F. Supp. 3d

26 1008, 1020 (S.D. Cal. 2016), the alleged facts do not support a determination that a non-

27 routine search was conducted.

28                                              - 24 -

1    During the hearing, Plaintiffs argued that an actual deprivation of an individual's

2  liberty must be at least as protected by the Fourth Amendment as is a search of property.

3  While Plaintiffs fail to provide any authority for this assertion, for purposes of this Order, the

4  Court accepts this assertion.  Additionally, Plaintiffs argue *United States v. Juvenile (RRA-A)*,

5  229 F.3d 737, 743 (9th Cir. 2000), controls Valenzuela's claim.  However, in *Juvenile (RRA-*

6  *A)*, the court stated, "A reasonable person handcuffed for four hours in a locked security

7  office *after a narcotics search* 'would have believed that [s]he was not free to leave.'"  229

8  F.3d at 743, *emphasis added, citation omitted*.  In other words, the handcuffing and length

9  of detention were not the sole reasons for the finding of an arrest.  Rather, as argued by

10  Defendants, handcuffing or detaining an individual during a border search does not violate

11  the Fourth Amendment.  *United States v. Nava*, 363 F.3d 942 (9th Cir. 2004).  As the other

12  detentions alleged in the Complaint were not as extensive as this one involving Valenzuela,[6]

13  the Court finds the Complaint fails to allege any individual detention involved a non-routine

14  seizure.  Further, Plaintiffs have not provided any controlling authority for a conclusion that

15  the cumulative effect of multiple individual detentions constitutes a non-routine detention.[7]

16  Rather, the detentions were not so intrusive as to warrant a conclusion that cumulative

17  detentions must be considered non-routine.

18

19

20

21    [6]This entire incident lasted approximately five hours.

22    [7]Plaintiffs argue common sense compels a conclusion that cumulative detentions
   constitute a non-routine detention.  Further, they point out that the Second Circuit Court of

23  Appeals has stated, "in some circumstances the cumulative effect of several routine search
   methods *could* render an overall search non-routine[.]"  *Tabbaa v. Chertoff*, 509 F.3d 89, 99 (2d

24  Cir. 2007), *emphasis added*.  However, the *Tabbaa* court was discussing multiple search
   methods, not multiple searches – plaintiffs had been subjected to pat-downs, fingerprinting,

25  photographing, and spreading of feet, in addition to questioning.  Additionally, the *Tabbaa* court

26  stated, "'common sense and ordinary human experience' suggest that it may take up to six hours
   for CBP to complete the various steps at issue here, including vehicle searches, questioning, and

27  identity verification, all of which we have already found to be routine."  509 F.3d at 100.

28                                      - 25 -

1    C. *Motivation for Criminal Investigation*

2    The Complaint states:

3         Defendants' seizures of Plaintiffs at the border were motivated by, at best, an interest
4         in ordinary criminal investigations, rather than the specific permissible purposes
         which justify suspicionless stops at the border.  As a result, their seizures constituted
5         an end-run around the Fourth Amendment's limitations on ordinary criminal
         investigations.

6    Compl. ¶ 158.  Defendants argue, however, that the subjective motivation of officers is not

7    relevant because officials may examine and search those persons seeking to cross the border

8    for any or no reason.  *United States v. Tsai*, 282 F.3d 690, 694 (9th Cir. 2002).  However, the

9    *Tsai* court recognized that subjective motivation may be relevant in determining

10   reasonableness under the Fourth Amendment where "'Fourth Amendment intrusions

11   undertaken pursuant to a *general scheme* without individualized suspicion'" may be invalid

12   if the scheme as a whole "'pursue[s] primarily general crime control purposes.'"  *Id*. at 695,

13   *quoting City of Indianapolis v. Edmond*, 531 U.S. 32, 45-46, 47 (2000), *emphasis added in*

14   *Tsai*.

15         Indeed, Plaintiffs argue that what makes the "suspicionless stops improper were the

16   non-border related purposes of the Government's program as a whole."  Response, p. 8,

17   *citing Cano*, 934 F.3d at 1017-18 and *Whren v. United States*, 517 U.S. 806, 811–12 (1996).

18   But these cases address searches, not seizures.  Plaintiffs, however, have cited *Phillips v. U.S.*

19   *Customs and Border Protection*, No. 2:19-cv-6338-SVM-JEM, 2020 WL 4118010 (C.D. Cal.

20   Mar. 9, 2020), in support of the Complaint.  In *Phillips*, plaintiff asserted he was asked

21   "personal and political questions unrelated to CBP's routine functions, and unlike those a

22   normal traveler would face."  2020 WL 4118010 at *5.  Because the government's

23   justification for a detention lasting between six and seven hours was unclear, the court denied

24   the government's motion to dismiss.

25         It appears the length of detention was significant to the *Phillips* court.  Here, Plaintiffs

26   allege Adlerstein was detained for approximately four hours, Valenzuela was detained for

27   up to five hours, and Mensing was detained for up to three hours.  These detentions are

28

shorter than the detention in *Phillips*.  However, at issue in both cases is how the motivation

of the government affects the analysis.  The Ninth Circuit has stated:

> [I]f a seizure is supported by probable cause, "[t]hat action [is] reasonable 'whatever the subjective intent' motivating the relevant officials." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 [] (2011) (quoting *Whren*[, 517 U.S. at 814). In other words, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813 []. But – and this point is the critical one for present purposes – "purpose *is* often relevant when suspicionless intrusions pursuant to a general scheme are at issue." *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 [] (2000) (emphasis added).  In those circumstances, unlike where probable cause or reasonable suspicion exists, "'actual motivations' *do* matter.'" *al-Kidd*, 563 U.S. at 736 [] (emphasis added) (quoting *United States v. Knights*, 534 U.S. 112, 122 [] (2001)); *see also Whren*, 517 U.S. at 811 [].

*Perez Cruz v. Barr*, 926 F.3d 1128, 1138–39 (9th Cir. 2019).  *Perez Cruz* did not discuss the

search as either routine or non-routine; the search was not conducted at the border but

pursuant to a warrant for employment-related documents at a Los Angeles-area manufacturer.

The Complaint alleges Plaintiffs were detained without reasonable suspicion and for

improper purposes.  A limit on the permissible purposes for which exceptions, including the

border exception, "may be used limits the exceptions to the circumstances that generated

them and so furthers the original understanding of the Amendment." *Id*. at 1140.  In other

words, a limit on the permissible uses of the border exception may be used to further the

original understanding of the Fourth Amendment.  Indeed, "[a] focus on purpose where there

is no probable cause or reasonable suspicion for the search or seizure effectuates the original

meaning of the Fourth Amendment." *Perez Cruz*, 926 F.3d at 1140; *see also Tsai*, 282 F.3d

at 695 (subjective motivation may be relevant when intrusions are made pursuant to a general

scheme without individualized suspicion).  In light of *Perez Cruz* and *Tsai*, the Court finds

a possible limit on the border exception may be needed to effectuate the Fourth Amendment.

Additionally, the motivations of Defendants are at issue and are not clear.  The Court cannot

say the Complaint fails to state a Fourth Amendment claim upon which relief may be granted

1    as to the seizures of Valenzuela and Mensing.[8]

2       As to Adlerstein, Defendants argue probable cause existed to justify her arrest. "[I]f

3 a seizure *is* supported by probable cause, '[t]hat action [is] reasonable "whatever the

4 subjective intent" motivating the relevant officials.'" *Id*. at 1138–39. Specifically,

5 Defendants assert probable cause existed to arrest Adlerstein for attempting to bring to the

6 United States a person who did not possess proper documentation in violation of 8 U.S.C.

7 § 1324. Because 8 U.S.C. § 1158(a)(1) provides only that an alien who arrives in the United

8 States may apply for asylum, "irrespective of [the] alien's status[,]" Defendants assert "the

9 alien's ability to apply for asylum does not affect potential criminal liability for [] Adlerstein

10 under either 8 U.S.C. § 1324(a)(1)(A)(ii) or (a)(2)." Reply, p. 9. Plaintiffs argue, however,

11 that because seeking asylum at a port of entry is not a crime, "Adlerstein's presence with a

12 migrant acting lawfully could not have served as probable cause of any criminality."

13 Response, p. 17. Plaintiffs further assert entry had not been accomplished because the

14 asylum seeker in effect surrendered to the officials and Adlerstein was only an observer.

15 Plaintiffs' Complaint alleges Adlerstein knew the asylum seeker would present at the border

16 and she was present to accompany and observe; Adlerstein followed some distance behind

17 on the Mexican side of the border. Although Defendants argue Adlerstein's conduct falls

18 squarely withing the statute, where the allegations are that Adlerstein did not accompany the

19 asylum seeker and was a distance away from the asylum seeker, it is difficult to say

20 Adlerstein knowingly transported, moved, or brought or attempted to transport, move, or

21 bring the alien to the port of entry. Under the facts alleged in the Complaint, Plaintiffs have

22 state a claim that Adlerstein was arrested without probable cause.

23       Further, the Court disagrees with Defendants that summary judgment of this issue is

24 appropriate at this time. Plaintiffs have not had an opportunity to present disputed material

---

[8]The Complaint does not appear to state a Fourth Amendment claim regarding Adlerstein as to any detention other than the one that resulted in her arrest.

facts, whether they be in the form of, for example, deposition testimony of defense witnesses, deposition testimony of Adlerstein or any other witnesses for Plaintiffs, or other documentary evidence that may be revealed during discovery. *See* Fed.R.Civ.P. 56(d). The Court will deny the Motion for Partial Summary Judgment.

### D. *Conclusion as to Fourth Amendment Claims*

Plaintiffs have stated claims upon which relief may be granted as to the detentions of Valenzuela and Mensing.[9] Additionally, Plaintiffs have stated a claim upon which relief may be granted as to the arrest of Adlerstein.

## VIII. *Expungement of Records*

In their Complaint, Plaintiffs seek expungement of records, and information contained therein, maintained or possessed by Defendants regarding any unlawful arrests, detentions, or collected and maintained in violation of the Privacy Act.

Defendants argue that Plaintiffs have not alleged sufficient facts to demonstrate they are entitled to the extreme remedy of expungement. Indeed, courts may order expungement for constitutional violations only in extreme circumstances. *United States v. Smith*, 940 F.2d 395 (9th Cir. 1991). Extraordinary circumstances may include arrests that were executed for the purpose of harassment only, *United States v. McLeod*, 385 F.2d 734, 749–50 (5th Cir. 1967), where an arrest is unlawful, or where the government has engaged in misconduct, *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991); *see also United States v. Crowell*, 374 F.3d 790 (9th Cir. 2004). The reasonable inferences raised from non-conclusory content

---

[9]Although the Complaint includes facts relating to entries by Adlerstein on occasions other than May 5, 2019, the Response specifies: "Plaintiffs specifically challenge Ana Adlerstein's arrest on May 5, 2019; Jeff Valenzuela's arrests between December 2018 and January 2019; and all of Alex Mensing's detentions and interrogations between June 10, 2018, and October 15, 2019. Response, p. 5, n.2. In other words, the other encounters between Adlerstein and border officials are not at issue in the Fourth Amendment claim.

1    of the Complaint plausibly suggest Plaintiffs are entitled to equitable relief.  *Moss*, 572 F.3d

2    at 969.  Dismissal on this basis is not appropriate.

3

4    IX.  *Privacy Act*

5         Defendants seek dismissal of Plaintiffs' Privacy Act claims:  access claims pursuant

6    to 5 U.S.C. § 552a(d)(1) and actionable under 5 U.S.C. § 552(g)(1)(A)-(D), accuracy claims

7    pursuant to 5 U.S.C. §552a(e)(5) and actionable under 5 U.S.C. § 552(g)(1)(C), and catch-all

8    claims pursuant to 5 U.S.C. 552a(g)(1)(D).  Defendants do not seek dismissal of Plaintiffs'

9    amendment claims pursuant to the Privacy Act.  The parties agree the Privacy Act claims

10   against individual Defendants should be dismissed.

11

12        A.  *Access Claims*

13        Defendants argued in their Motion to Dismiss that Plaintiffs' access claims against

14   CBP are not ripe because Plaintiffs have not exhausted their administrative remedies.  During

15   oral argument, Defendants withdrew this argument as counsel has been informed that CBP

16   has sent correspondence to Plaintiffs advising them the document do not require amendment

17   and were properly collected for enforcement purposes.

18

19        B.  *Accuracy and Catch-All Claims*

20        To state a claim under the accuracy provisions of the Privacy Act, an individual must

21   allege: 1) that the government failed to fulfill its record keeping obligation, 2) which failure

22   proximately caused the adverse determination, 3) that the agency failed intentionally or

23   wilfully to maintain the records, and 4) that the plaintiff suffered actual damages."  *Rouse*

24   *v. U.S. Dep't of State*, 567 F.3d 408, 417 (9th Cir. 2009), *citations and internal quotation*

25   *marks omitted*.  Similarly, to state a catch-all claim, a plaintiff must allege:  "(1) a violation

26   of a Privacy Act provision; (2) that the agency's decision was intentional or willful; (3) that

27   the violation caused 'adverse effects'; and (4) that the plaintiff suffered actual damages."

28                                          - 30 -

1    *Singh v. U.S. Dep't of Homeland Sec.*, No. 1:12-CV-00498-AWI, 2014 WL 67254, at *5

2    (E.D. Cal. Jan. 8, 2014)).

3           Defendants assert Plaintiffs have not alleged actual damages caused by the alleged

4    Privacy Act violations.  Plaintiffs argue, however:

5           The Government demands this Court dismiss Plaintiffs' remaining Privacy Act
      accuracy, relevancy, expungement, and amendment claims on the mistaken view that
6      Plaintiffs must allege actual damages to pursue them. This is incorrect. Although
      Plaintiffs sought damages under these various Privacy Act theories of liability, *see*
7      Compl. ¶ 175, Plaintiffs also sought injunctive relief in the form of amendment and
      expungement, *see* Compl. ¶¶ 174–75. The requirement of pleading actual damages
8      only applies when seeking damages under the Privacy Act, not amendment or
      expungement.

9

10   Response, pp. 29-30.

11          If it is proven that an agency intentionally or willfully violated the accuracy or catch-

12   all categories of the Privacy Act, "a plaintiff may be awarded actual damages, plus attorney

13   fees and costs."  *Gillman v. United States*, No. CV 16-00001 JMS-RLP, 2017 WL 969180,

14   *3 (D. Haw. Mar. 13, 2017), *citing* 5 U.S.C. § 552a(g)(4); *Singh*, 2014 WL 67254 at *5.

15   However, as pointed out by Plaintiffs, the Ninth Circuit has permitted a claim where no

16   monetary damages were sought.  *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284,

17   1290 (9th Cir. 2019).  Additionally, Plaintiffs state:

18          Plaintiffs therefore oppose the Government's attempts to dismiss the injunctive
      component of their Privacy Act claims.  Plaintiffs do not oppose dismissal of their
19     Privacy Act prayer for damages, provided it is without prejudice to replead actual
      damages.

20   Response, p. 30.  In light of *Garris*, this is appropriate.

21

22   XV.  *Leave to Amend*

23          Within 30 days, Plaintiffs may submit an amended complaint to cure the deficiencies

24   outlined above.   An amended complaint supersedes the original complaint.  *Ferdik v.*

25   *Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992); *Hal Roach Studios v. Richard Feiner & Co.*,

26   896 F.2d 1542, 1546 (9th Cir. 1990).  After amendment, the Court will treat an original

27   complaint as nonexistent. *Ferdik*, 963 F.2d at 1262.  Any cause of action that was raised in

28
                                        - 31 -

the original complaint and that was voluntarily dismissed or was dismissed without prejudice is waived if it is not alleged in an amended complaint. *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).

Accordingly, IT IS ORDERED:

1.     The Motion to Dismiss For Lack of Jurisdiction and Failure to State A Claim and, in the Alternative, Partial Motion for Summary Judgment (Doc. 16) is GRANTED IN PART AND DENIED IN PART.

2.     The Motion to Dismiss is DENIED as to Plaintiffs' First Amendment claims, Fourth Amendment claims as to the detentions and interrogations of Valenzuela and Mensing, Fourth Amendment claim as to Adlerstein's arrest, and access claims under the Privacy Act.  The Motion to Dismiss is also DENIED to the extent Defendants argue Plaintiffs lack standing for prospective injunctive relief.  The Motion to Dismiss is GRANTED to the extent Plaintiffs are seeking to state a claim based on the "arrests" of Valenzuela.  The Motion to Dismiss is also GRANTED as to Plaintiffs' accuracy and catch-all claims for damages under the Privacy Act for failing to sufficiently plead actual, pecuniary damages.  Additionally, the Alternative Motion for Partial Summary Judgment is DENIED.

3.     To the extent Plaintiffs' base a Fourth Amendment claim on the "arrests" of Valenzuela, these claims are DISMISSED with prejudice.  Plaintiffs' accuracy and catch-all claims for damages under the Privacy Act are DISMISSED without prejudice.  Plaintiffs' Privacy Act claims against individual Defendants are DISMISSED with prejudice. Plaintiffs have 30 days from the date of this Order to file an Amended Complaint  in compliance with this Order.

. . . . .

. . . . .

1        4.      The claims that currently remain pending in this action are the First

2 Amendment claims, the Fourth Amendment claims as to Adlerstein's arrest and Valenzuela's

3 and Mensing's detentions and interrogations, and the Privacy Act access claims.

4        DATED this 30th day of September, 2020.

5

6

7                              Cindy K. Jorgenson

                              United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28