1
2
3
4

Christine Wee (SBN 028535)
ACLU Foundation of Arizona
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

5
6

*Counsel for Plaintiffs*
*(Additional counsel listed on next page)*

7

8
9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

10

11
12

Ana Adlerstein; Jeff Valenzuela, and Alex
Mensing;

CASE NO: 19-cv-00500-CKJ

**FIRST AMENDED COMPLAINT**

13
14

        *Plaintiffs*,

v.

15
16
17
18

United States Customs and Border
Protection; Mark Morgan; United States
Immigrations and Customs Enforcement;
Matthew Albence; Federal Bureau of
Investigation; and Christopher Wray;

        *Defendants*

19
20
21
22
23
24
25
26
27
28

Ahilan Arulanantham (*pro hac vice*)
aarulanantham@aclusocal.org
Mohammad Tajsar (*pro hac vice*)
mtajsar@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

R. Alexander Pilmer (*pro hac vice*)
Alexander.pilmer@kirkland.com
Kirkland & Ellis LLP
333 S. Hope Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 680-8405
Facsimile: (213) 680-8500

# INTRODUCTION

1.      When Ana Adlerstein, a journalist by training and a humanitarian volunteer, traveled to the United States Port of Entry in Lukeville, Arizona to observe a young migrant present an asylum claim, border officers arrested her. They took Ms. Adlerstein's belongings, patted her down, ran hands underneath her bra lining, and confined her barefoot in a cold, window-less holding cell for four hours. When she protested, a border official dismissed her complaints and announced, "The Fourth Amendment doesn't apply here."

2.      Plaintiffs disagree. The government's powers are not limitless. It cannot target people for intrusive surveillance, detention, searches, and interrogation because of their expressive political activity protected under the First Amendment. And it cannot use its border control powers—to regulate the import of goods, verify travelers' identities, and stop the entry of contraband—to conduct suspicionless fishing expeditions for criminal activity unconnected to border enforcement that it could not conduct within the country.

3.      Plaintiffs are three humanitarian activists against whom Defendants have used the border inspection process as a license to conduct repeated, lengthy, intrusive seizures, including detentions, searches, and interrogations—without any connection to legitimate border control functions. Defendants, three government agencies and their directors, have subjected each Plaintiff to repeated mistreatment even though Plaintiffs did not commit any crime, violate any customs or border regulation, or engage in any other activity that could reasonably give rise to a suspicion of criminality.

4.      For example, Plaintiff Jeff Valenzuela, a photographer and humanitarian volunteer, attempted to drive back into the United States at a port of entry in San Diego. When he arrived, border officers walked to his car, ordered him out, handcuffed him, and marched him into their offices. They took his belongings, searched his bags, and shackled him by his ankles to a steel bench. They left him there, chained, for hours. Eventually they brought him to a small room where they interrogated him about his volunteer work,

his associations, and his political beliefs.

5.    Plaintiff Alex Mensing crossed into the United States from Mexico twenty-eight times during a period of six months between June 2018 and October 2019. On *twenty-six* of those entries, agents summarily referred him for "secondary inspection," which for him included detention, searches, and repeated interrogation. During these interrogations, officers repeatedly asked him the same questions about his work, his finances, his associations, and his personal writings. These seizures became a routine part of his life: cross the border, get detained for hours, and be forced to answer the same questions by the government.

6.    Together, Plaintiffs—all of whom enjoy the unqualified right as United States citizens to return to their country of nationality—faced repeated and prolonged detentions and interrogations at the border. Because Defendants have engaged in these intrusive practices in the absence of any reasonable suspicion of criminal activity, and because these practices have no connection to the purpose of border inspections, they violate the Fourth Amendment. And because Defendants maintain records of Plaintiffs' activities and associations, and targeted them for surveillance based upon these activities and associations, Defendants' practices also violated the First Amendment and related federal law.

## JURISDICTION

7.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. § 552a. Because this lawsuit alleges violations of the United States Constitution and a federal statute, it raises questions of federal law.

8.    This Court has authority to grant damages under 5 U.S.C. § 552a, declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief (including the expungement of records) under the Constitution and 5 U.S.C. § 552a.

## VENUE

9.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because

Defendants are subject to the court's personal jurisdiction in this District.

## PARTIES

**I.    Plaintiffs**

    *A.    Ana Adlerstein*

    10.    Plaintiff Ana Adlerstein is a journalist and human rights defender with more than ten years of experience in humanitarian action, journalism, and storytelling. Ms. Adlerstein's reporting focuses on international human rights, migration, and refugees. Her stories have appeared in various programs, including National Public Radio's Morning Edition, This American Life, and Up First, as well as WNYC's Snap Judgment. She also has produced stories for Latino USA, Love + Radio, Gimlet Creative, and The Heart. Ms. Adlerstein's print reporting has appeared for NPR Digital, the Guardian, and Buzzfeed. She has also served as a consultant in the development of podcasts for clients such as Audible, Inc., CNN, and KQED.

    11.    Ms. Adlerstein has also worked with immigrant and refugee communities in the United States, Mexico, and Greece. Most recently in the United States, Ms. Adlerstein lived and worked in the small border town of Ajo, Arizona. While in Ajo, Ms. Adlerstein volunteered with other humanitarians working to support immigrants. With them, she coordinated and produced media reports about the challenges asylum seekers and humanitarian actors face in Southern Arizona. She also accompanied asylum seekers to the local United States Port of Entry in Lukeville.

    12.    Ms. Adlerstein is also a member of the Network on Humanitarian Action, an international academic network created to promote education, training, and research among humanitarian activists.

    13.    She earned her Bachelor of Art's degree in international intercultural studies from Pitzer College in 2011, and is completing a Master's degree in humanitarian action from Duesto University in Bilbao, Spain. She is a United States citizen. Her permanent residence is in Portland, Maine.

**B.    *Jeff Valenzuela***

14.    Plaintiff Jeff Valenzuela is a photographer and teacher. He is an organizer and member of Pueblo Sin Fronteras ("PSF"). PSF is a transborder organization made up of human rights defenders of diverse nationalities who provide humanitarian assistance to migrants. PSF activists also monitor and raise awareness of human rights abuses against migrants and refugees in Mexico and the United States. Since 2017, Mr. Valenzuela has actively documented, via photography, the humanitarian work in which he has been involved, using the medium to spread awareness about migrants in the U.S.-Mexico border region.

15.    Mr. Valenzuela is a United States citizen and currently resides in Tijuana, Mexico.

**C.    *Alex Mensing***

16.    Plaintiff Alex Mensing is an experienced human rights activist who has dedicated much of his work to assisting migrants and refugees in the United States and Mexico. Mr. Mensing is also a volunteer and organizer with PSF. He assists the organization in many of its core project areas, including providing humanitarian support to asylum seekers traveling to the United States, connecting migrants with legal counsel, coordinating the donation of food and clothing, and speaking out publicly in support of migrants and their rights.

17.    Mr. Mensing is a trained legal assistant, having last served as one at the University of San Francisco's Immigration and Deportation Defense Law Clinic. Mr. Mensing earned his Bachelor's degree from American University in 2010. He is a United States citizen. His permanent residence is in Petaluma, California. He currently lives in Tijuana, Mexico.

## II.    Defendants

18.    Defendant United States Customs and Border Protection ("CBP") is the agency within the Department of Homeland Security ("DHS") responsible for policing the borders, coastlines, and ports of entry of the United States. CBP is an agency of the

United States government within the meaning of the Privacy Act.

19.     Defendant Mark Morgan is the Acting Commissioner of CBP. As head of the agency, Mr. Morgan oversees all CBP operations, including its investigations, surveillance operations, and border control functions along the United States-Mexico border. He is named in his official capacity.

20.     Defendant Immigration and Customs Enforcement ("ICE") is the agency within DHS responsible for managing all aspects of the immigration enforcement process. ICE apprehends, incarcerates, and removes noncitizens from the United States. Homeland Security Investigations ("HSI") is a component of ICE and DHS's largest investigative arm, employing over 6,000 special agents in 30 field offices. HSI special agents are tasked with gathering intelligence and investigating violations of various immigration and border-related criminal laws. HSI also houses the Office of Intelligence and International Operations, both subcomponents dedicated to international intelligence gathering and responsible for collecting intelligence for use within HSI and by other DHS agencies. ICE and HSI are agencies of the United States government within the meaning of the Privacy Act.

21.     Defendant Matthew Albence is the Acting Director of ICE. Among other duties, Mr. Albence oversees the operation of ICE and its components, including HSI. He is named in his official capacity.

22.     Defendant Federal Bureau of Investigation ("FBI") is the principal federal law enforcement agency housed within the Department of Justice. Among other responsibilities, it is tasked with investigating violations of federal criminal law and collecting and maintaining intelligence records on individuals its agents investigate. Upon information and belief, the FBI collaborates with CBP and ICE's HSI in their investigation and surveillance of Plaintiffs. The FBI is an agency of the United States government within the meaning of the Privacy Act.

23.     Defendant Christopher A. Wray is the Director of the FBI. In his role, Mr. Wray directs and oversees the operations of the FBI, including work the agency performs

1   in its field offices nationwide. He is named in his official capacity.

2                    **STATEMENT OF FACTS**

3   **I.      The federal government unlawfully surveils and seizes United States citizen**

4   **        activists at the border.**

5          24.    Plaintiffs participate in an informal network of civil society organizations

6   and individual humanitarian activists that support migrants and refugees in Mexico,

7   Central America, and the United States.[1] All three Plaintiffs repeatedly crossed the border

8   and re-entered the United States as part of their humanitarian activities.

9          25.    Even though Plaintiffs are United States citizens, Defendants targeted each

10  Plaintiff for surveillance, detention, intrusive searches accompanied by excessive

11  physical restraint, and intensive interrogation at the border (hereinafter "intrusive

12  seizures") because of their lawful humanitarian activities, in violation of federal statutory

13  and constitutional law. In doing so, Defendants illegally exploited their authority to

14  conduct border inspections to subject Plaintiffs to intrusive seizures unconnected to the

15  purpose of border inspections.

16         26.    Defendants' surveillance and intrusive seizures of activists occurred across

17  the Southwest border states, including in Arizona and California. For instance, according

18  to a recently leaked confidential FBI document produced out of the FBI's field office in

19  Phoenix, the agency gathered intelligence on individuals and groups protesting United

20  States immigration policies.[2] The document, styled as an "External Intelligence Note"

21  and dated May 30, 2019, describes border activist groups as "anarchist extremists," and,

22  according to the reporters who published the document, states that the "the bureau is

23  tracking border protest groups and labeling them a source of potential violence," even

24

25          [1] AMNESTY INTERNATIONAL, 'Saving lives is not a crime': Politically motivated legal harassment against migrant human rights defenders by the USA (2019) at 6, http://bit.ly/SavingLivesAmnesty.

26          [2] Jana Winter & Hunter Walker, *Exclusive: Document reveals the FBI is tracking border protest groups as extremist organizations*, YAHOO NEWS (Sep. 4, 2019), https://news.yahoo.com/exclusive-document-reveals-the-fbi-is-tracking-border-protest-groups-as-extremist-organizations-170050594.html.

27

28

though "almost all of the evidence cited in the report involved nonviolent protest activity."[3]

27.     The sources for the leaked Note are listed as including both a "human source with direct access" to the target organizations during a period between May 2018 and February 2019 (during which the majority of Plaintiffs' seizures occurred), as well as "DHS open source intelligence collection." Upon information and belief, "DHS open source intelligence collection" refers to the FBI's reliance on ICE and CBP surveillance and intelligence gathering operations, demonstrating close relationships between Defendant agencies in surveilling Arizona-based immigrant activist groups.

28.     Likewise, Defendants run another surveillance program dubbed "Operation Secure Line," a government operation "designated to monitor the migrant caravan."[4] Under the operation, starting in May 2018 and escalating in December 2018 and January 2019, officers of Defendants CBP, FBI, and ICE began surveilling and intrusively seizing activists and legal workers at the border—including Plaintiffs.[5]

29.     A leaked internal DHS email dated December 1, 2018 from David Shaw, the Special Agent in Charge of the San Diego HSI office, to all his subordinate agents, stated that HSI is "increasing our intelligence collection efforts" in response to the migrant caravan.[6] Shaw instructed agents to "question available sources of information to include Confidential Informants (C/Is) and Sources of Information (SOIs) regarding the

---

[3] *Id.*

[4] Tom Jones, et al., *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 SAN DIEGO (Mar. 6, 2019), http://bit.ly/NBC7story.

[5] Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment From U.S. and Mexican Authorities*, THE INTERCEPT (Feb. 8, 2019), https://theintercept.com/2019/02/08/us-mexico-border-journalists-harassment/; Kate Morrissey, Volunteers, Activists, Journalists Interrogated at Border About Caravan, THE SAN DIEGO UNION-TRIBUNE (Feb. 11, 2019), http://bit.ly/2XWuPfP (describing volunteers, activists, and journalists detained and interrogated at the border).

[6] Mari Payton et al., *Leaked Email Reveals How Federal Agents Used Confidential Sources and Informants to Gather Information about Migrant Caravan*, NBC 7 SAN DIEGO (Mar. 8, 2019), http://bit.ly/2SygYGG.

migrants, the caravan and it's [sic] leaders, and any criminal or cartel related actions concerning migrants or the caravan."[7] All information received was to be "documented as per standard operating procedures" and forwarded to the agency's Chief Intelligence Officer.[8] The email further stated that the information "is being collected locally through the Incident Command Center, our SIG agents and IRS, and being routed through Headquarters [in Washington D.C.]."[9] The reference to intelligence routed through Washington demonstrates the national scope of this surveillance and intrusive seizure program.

30.     One month later, Defendants created a secret database of 59 individuals—including two of the three Plaintiffs—who associated with or otherwise supported migrants seeking asylum in the United States.[10] Many of them, like Plaintiffs, are United States citizens. One of the purposes of the list was to memorialize "who officials think should be targeted for screening at the border" and for further scrutiny, including revocations of travel privileges and international alerts limiting the targets' ability to travel expeditiously.[11] All three Defendant agencies jointly manage and access the list and intrusively seized the individuals included therein.

31.     In response to a letter signed by a coalition of more than 100 organizations expressing opposition to Defendants' surveillance program, CBP conceded that it "may inconvenience law-abiding persons in our efforts to detect, deter, and mitigate threats to our homeland," but nonetheless defended the program and made clear the agency's intent to continue it.[12]

32.     Defendants' surveillance and intrusive seizures of Plaintiffs across the Southwest involved coordination between Defendant CBP, responsible for the border

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See* Jones, *supra* note 4.
[11] *Id.*
[12] Randy J. Howe (Executive Director of CBP's Office of Field Operations), Letter to Mana Azarmi (May 9, 2019), *available at* http://bit.ly/2Sw6YNZ.

seizures, Defendant ICE's HSI, responsible for the interrogations, and Defendant FBI, which provided analysis and support to the other agencies.

**II.** **The government surveilled and intrusively seized Plaintiffs at the border.**

    *A.*     *Defendants unlawfully arrested Ana Adlerstein in Lukeville, Arizona for accompanying an asylum seeker to the port.*

33.    Plaintiff Ana Adlerstein is a longtime human rights volunteer and activist with a background in journalism and storytelling. Defendants subjected her to an unlawful arrest at the border because of her attempt to accompany an asylum seeker to a port of entry.

34.    Ms. Adlerstein began accompanying asylum seekers to the Lukeville Port of Entry on November 27, 2018. On that day, she traveled to Lukeville accompanying a Guatemalan man who intended to present himself lawfully at the port to seek asylum. CBP officials denied the man access to the port, however, and pushed him back from the border.

35.    Following this incident, Ms. Adlerstein continued volunteering in Ajo, Arizona and neighboring Sonoyta, Mexico throughout the winter of 2018–19.

36.    On March 6, 2019, Ms. Adlerstein and a few of her fellow volunteers accompanied a group of sixteen individuals—eight adults and eight children—traveling from Sonoyta to the Lukeville Port to seek asylum. When the group arrived at the port, Ms. Adlerstein witnessed CBP officials physically accost these sixteen individuals, including ripping children from their parents' arms.

37.    Ms. Adlerstein did not cross into the United States with the group. She instead did so that evening, at which time CBP officials detained her and directed her to secondary screening.

38.    On May 5, 2019, Ms. Adlerstein planned to accompany an asylum seeker from Honduras to the Lukeville Port of Entry. Four days earlier, this individual had presented in Lukeville, but CBP officials turned her away. Ms. Adlerstein planned to accompany the asylum seeker to the port on May 5 to ensure she was not turned away

again. For further assurances, Ms. Adlerstein arranged for the individual's immigration lawyer to contact Lukeville officials in advance and inform them that his client intended to arrive at the port later that day.

39.     That afternoon, at around 3 p.m., the asylum seeker approached the Lukeville Port of Entry alone. Ms. Adlerstein stood some distance from the port on the Mexican side of the border, and observed CBP officials again refuse the asylum seeker entry. Ms. Adlerstein then approached the port and asked the border officials why the individual was denied entry. A CBP officer apologized and said, "We're processing another family," and asked if Ms. Adlerstein and the asylum seeker could return in a couple of hours.

40.     Consistent with this instruction, the asylum seeker returned to the port at 5 p.m., with Ms. Adlerstein following some distance behind on the Mexican side of the border. When they arrived, a supervisory CBP officer named Williams stormed out of the port and yelled, "How many?" in Ms. Adlerstein's direction. Another CBP officer standing outside the port building held up one finger. Williams responded, "Ok! One asylum-seeker, and an illegal alien smuggler," referring to Ms. Adlerstein.

41.     By this point, Ms. Adlerstein was on the American side of the border (demarked by a dotted yellow line on the ground), but did not intend to cross with the Honduran asylum seeker into the United States. CBP officials nevertheless arrested her.

42.     Officer Williams walked the asylum seeker and Ms. Adlerstein to an office inside the port, repeatedly calling Ms. Adlerstein an "illegal alien smuggler." At one point, he said, "You know, I could arrest you for this," and then later repeated, "I'm going to arrest you for this."

43.     In response to these threats and concerned for her safety, Ms. Adlerstein asked, "Am I under arrest?" Williams responded, "Yes." Confused, Ms. Adlerstein again asked whether she was under arrest. Officer Williams again responded, "Yes."

44.     Ms. Adlerstein, now terrified of what was happening and fearing she would be interrogated, informed Officer Williams that she wished to speak to her lawyer. She

1    showed the CBP officials a letter written on her behalf from the American Civil Liberties

2    Union Foundation of Southern California. The letter stated that its signatory, Mohammad

3    Tajsar (one of Plaintiffs' counsel), represented Ms. Adlerstein for purposes of her travel

4    back into the United States from Mexico; that Ms. Adlerstein, as a United States citizen,

5    is entitled to return to the United States as a matter of law; and that Ms. Adlerstein would

6    refuse to answer any questions beyond those necessary to identify her as a citizen. *See*

7    Exhibit A.

8         45.    Officer Williams took the letter, but did not read it. Instead, he threw it on a

9    nearby desk and said, "Tell your lawyer to come down here. We'll arrest him too."

10        46.    Border officials then took Ms. Adlerstein to a small concrete cell. It had

11   one toilet and one sink, a long bench, and four walls with an open roof. A female officer

12   appeared and searched Ms. Adlerstein's person by spreading her legs, aggressively

13   patting her down, and inspecting her body (including under the wiring of her bra). The

14   officer offered Ms. Adlerstein a glass of water and a thermal blanket. Ms. Adlerstein

15   accepted both and sat down in the cell.

16        47.    Later, another official arrived to fingerprint Ms. Adlerstein and ask her

17   questions to fill out some forms. Ms. Adlerstein continued to insist on a conversation

18   with her lawyer throughout her processing, and resisted providing her address to this

19   official. Hearing that Ms. Adlerstein refused to provide her address, another official

20   appeared at her cell and asked her to provide her address so that "you can get out of

21   here." This official informed Ms. Adlerstein that "We can't hold you for more than eight

22   hours, but we can hold you for up to eight hours." Ms. Adlerstein then provided her

23   permanent address, only because she believed her failure to do so would result in an even

24   more prolonged detention.

25        48.    While she was arrested and locked away in her cell, CBP officers denied

26   Ms. Adlerstein's requests to make any telephone calls. One of the officers did contact

27   Ms. Adlerstein's mother to inform her that her daughter had been arrested, but refused to

28   allow Ms. Adlerstein to speak directly to her mother.

49.     Throughout her detention, various officers at numerous times accused Ms. Adlerstein of "smuggling illegal aliens" and violating 8 U.S.C. § 1324 (the federal statute criminalizing harboring certain undocumented immigrants), despite the absence of any evidence she had done so.

50.     As the hours went by, Ms. Adlerstein became increasingly concerned for her wellbeing. The cell was cold, she was barefoot, and the headache which she entered her cell with began to intensify.

51.     By around 9 p.m., four hours into her detention and with no end in sight, Ms. Adlerstein began banging on the doors of the cell and yelling. An officer appeared at the cell door and asked, "What do you want?" Ms. Adlerstein responded by asking "Why are you detaining me?" The officer responded, "There is an ongoing investigation, it won't take long."

52.     Ms. Adlerstein asked the officer, "How long can you detain me?" He replied, "Indefinitely."

53.     Ms. Adlerstein again asked if she could speak with her lawyer. He responded, "No, because there aren't any charges yet."

54.     As Ms. Adlerstein became increasingly concerned and upset, she told the officer that he and his colleagues were violating her rights and detaining her for far too long. He dismissed her complaints, stating, "The Fourth Amendment doesn't apply here." Multiple border officials repeated this same phrase to Ms. Adlerstein during her detention.

55.     Ms. Adlerstein eventually demanded the officers call her an ambulance, as her headache had become unbearable. In response, an officer ultimately took her out of the cell and brought her into the nearby office. There, officers informed her that they could release her but that she needed to give them her contact information. At that time, a CBP officer told her: "There's an ongoing investigation, which is why I'm holding you so long." He informed her that "HSI wants to do a deferred interview," explaining that this was the reason the officials needed her contact information. Ms. Adlerstein,

understanding that she would not be released without disclosing her contact information, finally provided it against her will. The officers then released her.

56.     Approximately ten days later, an HSI official, James Mike Stanton, contacted Ms. Adlerstein by telephone and asked to speak with her regarding her experience. Ms. Adlerstein's counsel asked that he provide the questions he wished her to answer in writing. Mr. Stanton never did.

57.     Following her May 5 arrest, Ms. Adlerstein traveled to Mexico three times, twice when driving her own car and once driving in a friend's vehicle. Ms. Adlerstein was not accompanying or observing any asylum seekers on any of these three occasions. Nonetheless, on the two occasions she drove her own vehicle, May 9 and May 11, Ms. Adlerstein's vehicle was stopped at the U.S.-Mexico border by U.S. border officials who referred her to secondary inspection and searched her vehicle. Each of these secondary detentions lasted approximately fifteen minutes. On the other occasion, she was let through without incident.

58.     Because of her May 5 arrest, Ms. Adlerstein stopped legally accompanying individuals at Lukeville, and dramatically cut her lawful volunteer work in Sonoyta, as she is scared to continue her work on behalf of asylum seekers. Ms. Adlerstein fears that Defendants will continue to subject her to unlawful detention and arrest at the border, particularly if she were to accompany migrants. Given that border officers justified her arrest by claiming she illegally smuggled an asylum seeker when accompanying the individual, Ms. Adlerstein's fear is well-founded.

59.     This fear prevented Ms. Adlerstein from volunteering at the border. Despite planning on doing so in the future, she stopped observing migrants who wished to present asylum claims at the Lukeville Port of Entry, fearing that Defendants' officers would arrest her again. For instance, shortly after her arrest, management at a Sonoyta-based migrant shelter informed Ms. Adlerstein that a woman and her child had arrived at the shelter and had planned on presenting themselves at the Lukeville port to seek asylum. Shelter management asked if Ms. Adlerstein would observe the woman and her child

presenting themselves at the border. In large part due to her arrest, Ms. Adlerstein refused and informed management that she felt unsafe accompanying the woman given Ms. Adlerstein's recent arrest.

60. Defendants' arrest also prevented Ms. Adlerstein from creating an asylum clinic based out of Sonoyta, a project she had been working on for months prior to her arrest. In conjunction with immigration lawyers with whom she had been communicating, Ms. Adlerstein developed a program that would connect asylum seekers with lawyers who could provide legal advice to migrants who sought it, and that would facilitate the observation of asylum seekers presenting asylum claims at Lukeville. Among other tasks, Ms. Adlerstein planned on interfacing directly with Lukeville border officers to develop the safest and most efficient process for asylum seekers to present themselves at the port.

61. Ms. Adlerstein also planned on becoming a program director for this new clinic. However, following her arrest, these plans collapsed. Ms. Adlerstein could not ensure the safety of herself or others who might accompany asylum seekers to the port, and felt that Defendants' hostility to humanitarian volunteers made the formation of this clinic impossible.

62. The leaked May 30 External Intelligence Note, *see supra* ¶¶ 26–27, further confirmed Ms. Adlerstein's fear of further surveillance and arrest.

63. Ms. Adlerstein has never been arrested or convicted of any crime. Nor has she ever smuggled or trafficked migrants across the U.S.-Mexico border, or directed or knowingly assisted, encouraged, induced, or brought any migrants to enter the United States without authorization.

**B.   *Defendants illegally maintain records about Jeff Valenzuela and Alex Mensing and subjected them to repeated seizure at the border.***

64. Plaintiffs Jeff Valenzuela and Alex Mensing are long-time humanitarian activists and are volunteers with Pueblo Sin Fronteras, a transborder organization made up of human rights defenders. PSF volunteers are driven by their basic belief that

1  migration is a human right, and that vulnerable populations of migrants deserve access to

2  necessities like food, clothing, shelter, and health care. PSF promotes accompaniment,

3  humanitarian assistance, leadership development, recognition of human rights,

4  coordination of know-your-rights trainings, and support to immigration detainees in the

5  United States and their families and communities in the United States and in Mexico.

6       65.     Defendants' intrusive seizure program collected an extraordinary amount of

7  information about Plaintiffs Valenzuela and Mensing. Both Plaintiffs are included in the

8  Operation Secure Line "list" of targets. For every individual on that list, the database

9  includes their photograph, their name, their date of birth, their "country of

10  commencement," and their alleged "role" within the larger cross-border migrant support

11  network. The list also includes information about whether Defendants placed an alert on

12  the person (under a space called "Alert Placed"), whether Defendants detained, arrested,

13  or interviewed a person (demarked by a colored "X" mark over their photo), and whether

14  the United States government revoked their visa or Trusted Traveler pass (under a space

15  called "Disposition").

16       66.     The Secure Line list shows Plaintiffs Alex Mensing and Jeff Valenzuela as

17  follows:

 

27       67.     In addition to the list itself, Defendants also created separate, individual

28  dossiers on each person in the database containing private and First Amendment-

protected information. In the case of one dossier, Defendants amassed a trove of records about the individual, "including specific details about the car she drives, her mother's name, and her work and travel history," as well as information that describes her associational activity with migrants and other humanitarian organizations.[13] Upon information and belief, Defendants maintain dossiers of Plaintiffs Alex Mensing and Jeff Valenzuela containing similar private First Amendment-protected information.

### 1.   Jeff Valenzuela

68.    Mr. Valenzuela is a long-time humanitarian activist and organizer. He has volunteered with PSF since the middle of 2018. Prior to that, Mr. Valenzuela provided humanitarian assistance to migrants in Tijuana who had arrived in the city after traveling through Mexico.

69.    Beginning in October 2018, Mr. Valenzuela began more actively volunteering with migrants traveling through Mexico. In early November 2018, for example, Mr. Valenzuela traveled to Tijuana, where he met with locals and authorities and helped establish a migrant shelter at the Benito Juarez sports complex.

70.    Mr. Valenzuela has had a lifetime of travel across the border between California and Mexico. Prior to July 2018 (when he began the bulk of his volunteer work with migrants in Mexico), he had only been referred to secondary inspection once. Beginning in December 2018, however, Defendants identified Mr. Valenzuela as a person of interest, began surveilling his activities and his work, and targeted him for intrusive seizures at the border.

71.    On December 26, 2018, Mr. Valenzuela traveled into the United States via the PedWest pedestrian port within the larger San Ysidro Port of Entry. After presenting his passport, Defendants referred Mr. Valenzuela to secondary screening. A CBP officer in a waiting room at the port then instructed Mr. Valenzuela to leave his wallet and telephone in the room's counter.

---

[13] Jones, *supra* note 4.

72.     After he had waited for two hours, two plainclothes officers, whom upon information and belief were HSI officers, escorted Mr. Valenzuela into an interview room. They began asking him a series of questions about himself, his work, about the caravan generally, and about the condition of migrant shelters in Tijuana.

73.     These officials asked Mr. Valenzuela what he did for work and what he was doing in Tijuana.

74.     They then asked, "Are you part of an organization?" Mr. Valenzuela responded that he volunteered with several different organizations. The officials asked him to identify them, which he reluctantly did.

75.     The officials also asked Mr. Valenzuela about conditions at a specific migrant shelter in Tijuana named El Barratel. As part of this line of questioning, one of the officials informed Mr. Valenzuela that their questions were designed to allow the officials to ascertain the conditions at the shelter, explaining that they needed to question "people like" Mr. Valenzuela in order to find out this information.

76.     The questioning lasted approximately fifteen minutes. The officials took notes of the entire interrogation on notepads, then placed them in records available for other officials within the Defendant agencies to review.

77.     When the questioning ended, one of the officials left the room and returned with Mr. Valenzuela's telephone. The officials then informed Mr. Valenzuela that they needed to review the contents of his telephone, saying, "It's standard procedure to make sure you don't have child pornography." They demanded he show them his phone's contents, and informed him that his refusal would result in its confiscation and delivery to a second location. They told him that he risked having his phone unlocked at this second location if he did not comply.

78.     Fearing that he had no other choice, and not wanting to lose his mobile phone indefinitely, Mr. Valenzuela did as instructed. He allowed the officials to scroll through photographs on his telephone. The official perusing his phone periodically stopped and asked questions about his photographs, wanting to know details about the

1   pictures.

2       79.     The officials eventually released Mr. Valenzuela after holding him for

3   approximately two and a half hours. Mr. Valenzuela returned to Mexico that same day.

4       80.     Two days later, on December 28, Mr. Valenzuela again attempted to cross

5   the border from Mexico into the United States. This time, he crossed at San Ysidro via

6   automobile.

7       81.     When he pulled up to the initial port inspection area to hand his passport to

8   a CBP officer, he was immediately flagged and referred to secondary inspection. Two

9   officers then approached his vehicle. The officers abruptly asked him to exit the vehicle

10  and demanded he place his hands behind his back. The officers then handcuffed him.

11  "This is just standard procedure," they claimed.

12      82.     The officers then walked him to a window-less booking room past a

13  discreet door nearby. It was a long room, with CBP officers stationed behind a counter.

14  At that point, CBP agents removed his handcuffs and instructed Mr. Valenzuela to place

15  his hands on the counter while they searched him and removed his belongings, including

16  his wallet and telephone.

17      83.     Officers then sat Mr. Valenzuela on a bench in the room and shackled his

18  ankles with handcuffs to the bench's steel legs. They held Mr. Valenzuela chained to the

19  bench for four hours. They did not permit him to move from the bench except on two

20  brief occasions, when they agreed to allow him use of a nearby restroom.

21      84.     Four hours later, two other plainclothes officers came to Mr. Valenzuela

22  and removed the cuffs at his ankles. They escorted him to an interview room with a metal

23  table and metal stools, then positioned him across from them. After seating him in that

24  intimidating setting, one officer sitting directly across from him, named Ochoa, began to

25  aggressively interrogate Mr. Valenzuela while the other officer sat in a chair off to Mr.

26  Valenzuela's side. Both had notepads and took notes as Mr. Valenzuela answered their

27  questions.

28      85.     "We figured you knew what this was about," said Ochoa. Mr. Valenzuela

1   understood Ochoa to mean that the officials wanted to speak to him about his

2   humanitarian work with migrants.

3        86.    Given the intimidating setting and his fear of being chained up again for

4   hours, Mr. Valenzuela felt pressured into responding to the questions. What followed was

5   an interrogation that featured many of the same questions border officials asked him two

6   days prior.

7        87.    The interrogation began with Ochoa asking Mr. Valenzuela where and with

8   whom he lives. Mr. Valenzuela answered.

9        88.    Ochoa then asked what Mr. Valenzuela does for a living, and how he

10  makes money. Feeling pressured to respond, Mr. Valenzuela reluctantly disclosed

11  information.

12       89.    The agents eventually turned the subject of the questions to Mr.

13  Valenzuela's political beliefs. They asked him, "Why do you do what you do?" When

14  Mr. Valenzuela responded, Ochoa stated, "I know you're doing this from a humanitarian

15  point of view. You're doing the right—, what you think is the right thing."

16       90.    The questioning lasted approximately fifteen minutes.

17       91.    At the conclusion of the questioning, the officers confiscated Mr.

18  Valenzuela's smartphone. They returned it to him approximately forty-five minutes to

19  one hour later.

20       92.    When Mr. Valenzuela inspected the phone, he found that border officials

21  had accessed the email application on his device, even refreshing it to pull more recent

22  messages. He also discovered that most of the other applications on his device had been

23  accessed.

24       93.    Mr. Valenzuela's entire detention lasted approximately five hours.

25       94.    Approximately two weeks later, on January 9, 2019, Mr. Valenzuela

26  traveled again via automobile through San Ysidro. Defendants again referred him to

27  secondary inspection. Two plainclothes officers—upon information and belief, HSI

28  officials—walked up to Mr. Valenzuela's vehicle to question him.

95.     The officials informed Mr. Valenzuela that he should expect continued referrals to secondary inspection each time he crossed the U.S.-Mexico border. One of the officials informed Mr. Valenzuela that he had reviewed Mr. Valenzuela's file, and asked if Mr. Valenzuela had any additional information to report since his prior detention.

96.     The officer asked Mr. Valenzuela what he planned on doing in San Diego. He also asked if anything has changed regarding the caravan since the last questioning.

97.     While the interrogation at his car continued, other CBP officials conducted a canine search of Mr. Valenzuela's car.

98.     At the conclusion of the vehicle search, one of the officers informed Mr. Valenzuela that the government did not want him "smuggling people" or "documents," and that was the purpose of the secondary detention. This episode lasted approximately forty minutes.

99.     Mr. Valenzuela next crossed into the United States on January 10, 2019, when Defendants again referred him to secondary inspection. While attempting to cross on foot at PedWest, a CBP officer called Mr. Valenzuela to him and asked a few questions, including where he was headed, whether he would be returning to Tijuana, and what his purpose in the United States was. The agent noted Mr. Valenzuela's responses, and released him. This detention lasted less than fifteen minutes.

100.     Mr. Valenzuela next crossed into the United States on January 15, 2019 at PedWest, for a job interview. Defendants again referred Mr. Valenzuela to secondary. Two plainclothes officers who, upon information and belief were HSI officers, again questioned him, searched his backpack, and released him.

101.     The two officers included Ochoa, the same officer who had previously interrogated Mr. Valenzuela. Ochoa asked if any personal information had changed since the last detention. The officers asked Mr. Valenzuela where he was going, and he told them. They also asked Mr. Valenzuela when he would be returning to Tijuana, and whether he planned on any international travel outside Mexico soon.

102.    Ochoa then asked, "Do you guys have anything going on with the caravan?" Mr. Valenzuela, frustrated at being detained yet again, responded, "I'm just heading to a job interview."

103.    The officers then walked Mr. Valenzuela to the main booking area for secondary inspection. Mr. Valenzuela became visibly upset. He stated: "This is ridiculous, I'm crossing five hours early just in case you guys do this." One of the officers replied, smiling, "At least you're getting out of here faster." Mr. Valenzuela eventually was released after a forty-minute detention.

104.    Mr. Valenzuela next crossed into the United States on January 25, 2019 at San Ysidro by automobile. Once again, Defendants referred him to secondary inspection. Upon presenting his passport, CBP officers instructed Mr. Valenzuela to exit his vehicle while they searched it. They then demanded he place his hands behind his back, and handcuffed him.

105.    The officers walked Mr. Valenzuela to a secure room, then removed his handcuffs. After booking him into the facility, removing his belongings, and searching his shoes, they walked him over to a steel bench and again shackled him at his ankles to the bench.

106.    Having already been ankle cuffed to the bench before, and fearful of another prolonged arrest, Mr. Valenzuela asked an officer behind the counter, "Is someone going to come talk to me?" The officer responded that border officials were trying to figure that out.

107.    Shortly thereafter, an officer from outside walked into the room, unshackled Mr. Valenzuela's leg from the counter, returned his belongings, and walked him out to his car. This detention lasted approximately twenty to twenty-five minutes.

108.    Following these repeated detentions in December 2018 and January 2019, and following the revelation that Defendants' secret watchlist includes him, Mr. Valenzuela dramatically cut his humanitarian activity. He did this because he fears that further significant work, including with border organizations, would subject him to

repeated, additional scrutiny and arrest at the border, including shackling, arrest, and interrogation.

109.    Mr. Valenzuela has never been arrested or convicted of any crime. Nor has Mr. Valenzuela ever smuggled or trafficked migrants across the U.S.-Mexico border, or directed or knowingly assisted, encouraged, induced, or brought any migrants to enter the United States without authorization.

### 2.    *Alex Mensing*

110.    Plaintiff Alex Mensing is one of the longest-serving volunteers of Pueblo Sin Fronteras. He has volunteered with the organization since 2014. He has also worked for immigrants' rights organizations in Dilley, Texas and in San Francisco, California.

111.    In addition, Mr. Mensing is a frequent commentator on migration policy issues in North America, and is routinely cited in news reports on issues relating to the treatment of migrants in Mexico, Mexican immigration policy, and the conditions of migrants and refugees traveling to the United States. He is a widely known figure among civil society groups in the United States and Mexico who work on the rights of migrants and refugees.

112.    Mr. Mensing traveled between Mexico and the United States frequently, as often as four times per month from January 2017 to January 2019.

113.    Due to Mr. Mensing's public work on behalf of migrants, Defendants began a covert investigation into Mr. Mensing. This investigation included surveilling his activities and targeting him for repeated seizures, beginning in June 2018.

114.    Between June 10, 2018, and October 15, 2019, Mr. Mensing entered the United States from Mexico twenty-eight times. On twenty-six of those occasions, Defendants, acting in concert, subjected him to secondary inspection. These inspections resulted in repeated intrusive seizures, including unnecessary interrogation, detention, and physical searches and seizures of his person and his belongings.

115.    Eleven of the twenty-eight crossings occurred between June 10, 2018 and the end of October 2018. In that period, Mr. Mensing traveled into the United States on

the following dates: June 10, June 11, June 12, July 2, July 23, September 4, September 10, September 17, October 1, October 15, and October 23. On all but one of those occasions, CBP officers selected Mr. Mensing for intrusive seizures by steering him to secondary inspection. Each seizure lasted anywhere from twenty minutes to forty minutes. During them, border officials directed Mr. Mensing to sit on a bench in a room separate from the main traveler screening room, to not use his cell phone, and to not speak with any other travelers.

116.    After Mr. Mensing waited for varying amounts of time, the CBP officer reviewing his passport typically called on Mr. Mensing to stand and approach him or her, and proceeded to either release Mr. Mensing with a statement such as "You are free to go," or to first search his bag or interrogate him. The interrogations typically asked the same questions, including questioning about his destination, how long he had been in Mexico, what he was doing in Mexico, who he had been with in Mexico, what he was bringing from Mexico, what he does for a living, and other related questions. In some cases, officers reviewed Mr. Mensing's private notebooks, read his personal and professional written notes for several minutes, then questioned him about their contents.

117.    Beginning in November, Defendants' investigations and surveillance of Mr. Mensing intensified. Mr. Mensing flew into Los Angeles International Airport from Guadalajara, Mexico on November 11, 2018. Upon arrival, CBP officers steered him once again to secondary inspection, where he waited for approximately twenty minutes. An officer then directed Mr. Mensing to an area for secondary baggage review. While walking towards the baggage review area, the officer began asking Mr. Mensing questions about his work with migrants. He first asked Mr. Mensing what he did in Mexico. Mr. Mensing replied that he was volunteering.

118.    The officer then asked for whom he volunteered. Mr. Mensing, fearing he needed to answer the question in order to leave secondary inspection with his belongings, replied that he worked with refugees. The officer asked Mr. Mensing what his job was. Mr. Mensing replied that he was a paralegal.

119.    The officer then asked Mr. Mensing what he did with "asylum seekers" in Mexico, although to this point Mr. Mensing had not mentioned that he worked with asylum seekers. This question made him increasingly anxious about the officer's motives, and suggested to him that the federal government—including Defendants—gathered information about his activities in Mexico surreptitiously. Mr. Mensing repeated his earlier response that he worked and volunteered with refugees. The officer kept pressing Mr. Mensing on the type of work he did in Mexico, and what exactly he did *with* and *for* the asylum seekers. Mr. Mensing felt increasingly uncomfortable at the questions. Mr. Mensing noted that the officer's attitude was aggressive and indicated his disapproval of the questioning.

120.    Upon arriving to the baggage review area, the officer who had escorted Mr. Mensing there instructed him to sit on a bench and went to speak with a second officer who was at one of the x-ray machines. The escorting officer spoke with the second officer for several minutes before leaving, and the second officer then directed Mr. Mensing to approach and place his baggage on the conveyer belt. The second officer asked Mr. Mensing to clarify again the type of work he did, and Mr. Mensing repeated that he was a paralegal. The second officer informed Mr. Mensing that he needed this information to understand what work Mr. Mensing did in Mexico.

121.    The second officer ended his questioning of Mr. Mensing by asking him whether he recruited migrant workers and whether he worked with marijuana, to which Mr. Mensing responded "no" to both. Mr. Mensing was eventually released after approximately thirty minutes.

122.    Having been interrogated extensively about his work on November 11, Mr. Mensing expected Defendants to cease its intrusive seizures of him every time he re-entered the United States. They did not.

123.    On December 3, 2018, Mr. Mensing traveled into San Diego via the San Ysidro Port of Entry. After providing his passport at approximately 1:30 a.m., he was sent again to secondary inspection, detained, and interrogated. In the secondary

inspection area, CBP officers directed Mr. Mensing to sit and wait. Mr. Mensing overheard the officers who had his passport speaking about a computer screen record concerning Mr. Mensing having just been updated. After approximately one hour of waiting, Mr. Mensing asked the CBP officers if something was wrong. One of the officers indicated to Mr. Mensing that someone needed to speak with him, and that the person was on their way. Mr. Mensing began feeling increasingly nervous about the prospect of waiting a long period of time for a special officer to arrive to question him.

124.    During the wait, a male officer searched Mr. Mensing's backpack and the contents of his pockets. Later, a female officer again searched his backpack and the contents of his pockets, then removed all written materials from his backpack—including notebooks, receipts, and printed materials—to take them with her into another area out of Mr. Mensing's sight. After a considerable delay, she brought them back, put them on the officers' desk, and directed Mr. Mensing to put them back in his backpack.

125.    After Mensing had been waiting for approximately two and a half hours, two plainclothes officers—a man and a woman—entered the secondary screening area, announced Mr. Mensing's name, and ordered him to go with them. Upon information and belief, these two officers were agents of HSI. They took him into a separate area beyond a secure metal door. Then they escorted him down a hallway and entered a small cell-like concrete room with a secure metal door, which they closed, and ordered Mr. Mensing to sit on a metal seat at a small metal table. The female officer sat across from Mr. Mensing. The male officer stood in the corner with a notebook taking notes on the subsequent interrogation.

126.    The female officer proceeded to interrogate Mr. Mensing, asking him about his work, his education, what his favorite subject was in university, and what his parents' occupations were. The officer also pressed Mensing about his motivation for volunteering with refugees in Mexico. She replied to his response that she considered his perspective to be "dark." After about fifteen minutes, the officers escorted Mensing back to the main secondary inspection area, where his passport and belongings were returned to him and

1    he could leave. Mensing was very shaken by the encounter.

2         127.   The next time Mr. Mensing traveled into the United States, Defendants

3    once again subjected him to an intrusive seizure. On December 23, 2018, Mr. Mensing

4    again traveled by foot into San Diego via the San Ysidro Port of Entry at approximately

5    9:30 a.m. After providing his passport to a CBP officer, he observed the officer looking

6    somewhat confused and overheard her say, "What is this?"

7         128.   He was instructed to wait approximately forty-five minutes before two

8    plainclothes officers with badges arrived. Upon information and belief, these two officers

9    were also HSI agents employed by Defendant ICE. They later identified themselves as

10   officers Leon and Lenier.

11        129.   They instructed Mr. Mensing to walk to a back room. They forced him to

12   empty his pockets, and patted him down after placing his hands on a table. They then

13   escorted him to an interrogation cell. These actions made clear to Mr. Mensing that he

14   was not free to leave the room at his choosing or refuse to answer the agents' questions.

15        130.   The officers began interrogating Mr. Mensing. They asked him how long

16   he had been in Mexico, when the last time he entered Mexico was, and if he had been in

17   that interrogation cell before. Anxious, fearful, and upset at being detained yet again, Mr.

18   Mensing answered all their questions.

19        131.   The officers then asked what he was doing in Mexico, repeating a similar

20   line of questioning from prior detentions. They also asked him how long he had been

21   volunteering in support of migrants. Mr. Mensing reluctantly answered their questions.

22        132.   After asking many of the same questions Defendants had asked in prior

23   detentions, the officers pivoted to more intrusive, private matters. They began asking

24   about Mr. Mensing's personal finances, seeking details about Mr. Mensing's previous

25   jobs, how much money he earned in them, and how much he held in savings. They also

26   asked Mr. Mensing how he supported himself financially while in Mexico. Again, fearing

27   not being able to return to the United States, Mr. Mensing answered these questions.

28        133.   The officers then ended the interrogation by asking what he studied in

school, what his favorite parts of school were, and what subjects he specialized in—all questions they previously asked Mr. Mensing in prior detentions, including on December 3. Mr. Mensing answered the questions again, but only because he believed he had to respond in order to be released.

134.    At the conclusion of the interrogation, Officer Leon explained that he did not think Mr. Mensing was a criminal, but suggested that "some people [do]."

135.    The officers then asked to see Mr. Mensing's phone. Mr. Mensing replied that he did not bring one with him. Leon commented that not having a phone in Tijuana was a brave move.

136.    The officers finally informed Mr. Mensing that they were going to search his belongings "for drugs." They did so outside of Mr. Mensing's presence. Upon the officers returning with his belongings, Mr. Mensing asked if they had photocopied any of his belongings. Officer Lenier looked nervously at Leon, which Mr. Mensing interpreted as an affirmative response. He told them, "So, yes you did?" They responded by saying, "Just a few documents." The officers released him shortly thereafter.

137.    The entire detention on December 23 lasted between two and three hours.

138.    After returning to Mexico, Mr. Mensing next attempted to cross back in to the United States on January 11, 2019. He again entered via the San Ysidro Port of Entry by foot, this time at 6:40 p.m. When he presented his passport to a CBP officer named Salazar-Lopez, the officer asked him what he was doing in Mexico. Mr. Mensing replied that he was visiting friends and volunteering. The officer then asked Mr. Mensing where he was going. Mr. Mensing replied, "San Diego." The officer next asked what type of volunteering Mr. Mensing did. He responded that he volunteered with migrants.

139.    Salazar-Lopez then referred Mr. Mensing, yet again, to secondary inspection, where Defendants conducted another intrusive seizure.

140.    Once he was escorted to secondary, CBP agents forced Mr. Mensing to wait approximately twenty minutes. He was then presented with a telephone, and told that an officer on the other end would conduct the interrogation.

141.   Mr. Mensing took the phone and heard a voice introducing himself as CBP Officer Tamayo. Once again, the officer ran through a battery of questions that Mr. Mensing had repeatedly answered during prior seizures. He asked Mr. Mensing how long he had been in Mexico, where he was going, if he planned to return to Mexico, and approximately how long he would stay in the U.S. Mr. Mensing answered all these questions.

142.   Officer Tamayo then asked Mr. Mensing what he did in Mexico, then what kind of volunteer work he performed, and what he did with migrants.

143.   Officer Tamayo then questioned Mr. Mensing about whether he ever promised migrants anything, offered them any insight about what would happen to them, or if he ever gave migrants anything, and then if he was ever a point of contact for migrants.

144.   The questioning ended shortly thereafter, and Mr. Mensing was released. He spent a total of approximately thirty minutes in detention that evening.

145.   On January 18, 2019, Mr. Mensing traveled on foot into the United States through the San Ysidro Port of Entry, and was again referred to secondary inspection.

146.   Defendants held Mr. Mensing for twenty minutes, during which time an officer indicated to Mensing that someone needed to speak with him by telephone. Eventually the officer's desk phone rang. The officer spoke briefly with someone while looking at Mr. Mensing, but did not pass the phone to Mr. Mensing. After a brief conversation, the officer hung up the phone. He then indicated to Mr. Mensing that the person the officer had spoken to did not have any questions for him. Mr. Mensing was released after approximately thirty minutes.

147.   Following his last detention in the United States in January, Mr. Mensing feared crossing the border into the country again because Defendants consistently subjected him to intrusive seizures, repeatedly asking the same questions and without justification. After his return to Mexico, Mr. Mensing decided to remain in Mexico until September 2019. In light of public revelations that he and his fellow PSF volunteers are

1   under surveillance, and fearing that he will be singled out for future intrusive seizures,

2   Mr. Mensing stopped travelling to the United States during that period to visit his friends

3   and family.

4          148.    Beginning in September 2019, Mr. Mensing crossed into the United States

5   ten additional times, and on all ten occasions has been referred to secondary inspection.

6   On September 3, 2019, Mr. Mensing re-entered the United States via the Otay Mesa Port

7   of Entry in California. He assumed that after eight months of restricting his movement,

8   Defendants would not again refer him to secondary inspection or for interrogation. He

9   was wrong. Defendants again stopped him and referred him to secondary inspection for

10  another intrusive seizure. They detained Mr. Mensing for approximately twenty to

11  twenty-five minutes, searched his belongings, and interrogated him about his travel and

12  background.

13         149.    On September 12, 2019, Mr. Mensing again re-entered the United States

14  via the San Ysidro Port of Entry, and was once again sent to secondary inspection.

15  During the seizure, Defendants again searched Mr. Mensing's belongings, and again

16  interrogated him about his travel and where he lives.

17         150.    On the morning of October 7, 2019, Defendants referred Mr. Mensing to

18  secondary screening when he entered the San Ysidro Port by foot. At secondary, border

19  officials interrogated Mr. Mensing, including about his travels, where he works, and what

20  department of his employer he works in.

21         151.    At the same port on October 8, Defendants again referred Mr. Mensing to

22  secondary, and searched his belongings while detaining him.

23         152.    On October 9, Defendants detained Mr. Mensing at secondary at San

24  Ysidro, this time for forty minutes. During this detention, they interrogated him about his

25  travels, his employer (the answer to which border officials recorded in a computer), and

26  his residence. Defendants also searched all his belongings, including reading personal

27  notes he kept on loose sheets of paper inside a book that he carried in his backpack.

28         153.    On the next five times Mr. Mensing crossed into the United States, on

October 10, 11, 13, 14, and 15, Defendants subjected him to detention and secondary inspection on each occasion. During these detentions, Defendants searched Mr. Mensing's property and kept him detained for approximately ten minutes each time.

154.   Together, none of these intrusive seizures were justified. Mr. Mensing has never been arrested or convicted of a crime, and Defendants lacked any reasonable suspicion that Mr. Mensing had engaged in or was engaging in any criminal activity.

155.   Considering the repeated and ongoing detentions at the border, Mr. Mensing continues to fear that Defendants will detain, arrest, search, and interrogate him every time he crosses into the United States.

156.   As with Ms. Adlerstein and Mr. Valenzuela, Mr. Mensing has never been arrested or convicted of any crime. Nor has he ever smuggled or trafficked migrants across the U.S.-Mexico border, or directed or knowingly assisted, encouraged, induced, or brought any migrants to enter the United States without authorization.

## CLAIMS

### First Claim

### Violation of the Fourth Amendment

### (All Plaintiffs Against All Defendants)

157.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

158.   Defendants unlawfully and without legal justification seized Plaintiffs Ana Adlerstein, Jeff Valenzuela, and Alex Mensing while they attempted to cross into the United States, in violation of the Fourth Amendment. These seizures included detentions, arrests, physical restraints, and interrogations. Defendants' seizures of Plaintiffs at the border were motivated by, at best, an interest in ordinary criminal investigations, rather than the specific permissible purposes which justify suspicionless stops at the border. As a result, their seizures constituted an end-run around the Fourth Amendment's limitations on ordinary criminal investigations.

159.   These seizures were unsupported by any suspicion of criminal wrongdoing, and exceeded the scope of Defendants' authority to detain Plaintiffs at the border.

160.    Defendants unlawfully seized Plaintiffs multiple times, each time without lawful basis. Even if any initial detention or detentions of Plaintiffs were lawful, Defendants had no legal authority to perform subsequent and repeated detentions of Plaintiffs in circumstances in which the detentions did not and could not elicit any additional information necessary for Defendants to perform their border control functions.

161.    Plaintiffs are entitled to an order declaring these seizures violative of the Fourth Amendment, and to an order enjoining any such future seizures when unsupported by reasonable, articulable suspicion of border-related criminal activity.

162.    Plaintiffs are also entitled to expungement and destruction of all records which contain information gathered about Plaintiffs as a result of Defendants' unlawful seizures at the border.

### Second Claim

### Violation of the First Amendment

### (All Plaintiffs Against All Defendants)

163.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

164.    Defendants are conducting a dragnet surveillance operation that has resulted in the investigation of and collection of information about dozens of journalists, legal workers, and humanitarian volunteers who have documented the plight of, associated with, been in contact with, or otherwise charitably supported migrants traveling through Mexico to seek asylum in the United States.

165.    Defendants' program to collect and maintain private information about Mr. Valenzuela and Mr. Mensing—information which is protected by the First Amendment— violates these Plaintiffs' rights to freedom of speech and freedom of association guaranteed by the First Amendment to the United States Constitution. Defendants had no suspicion that these Plaintiffs had engaged in any criminal activity, and therefore had no justification for collecting information and maintaining records about their First Amendment-protected activities, speech, and associations. Reporting on the creation of

the Secure Line list, as well as Defendants' public statements made in response, reveals that suspicion of past or future criminal activity did not motivate Defendants' investigatory interest in these Plaintiffs.

166.   In addition, Defendants' arrest of Ms. Adlerstein violated her First Amendment right to free association because her associations with the migrants she lawfully accompanied to a port of entry directly caused her prolonged and unjustified arrest.

167.   As a direct and proximate cause of Defendants' actions, Plaintiffs have been chilled or otherwise prevented from exercising their rights to free speech and free association. Defendants' surveillance and intrusive seizures of Plaintiffs, and their maintenance of a secret watchlist containing Plaintiffs' private and protected information, prevents Plaintiffs from continuing their First-Amendment protected activity.

168.   Plaintiffs are entitled to the expungement of all records unlawfully created and maintained pursuant to Defendants' scheme, as well as an order enjoining Defendants from continuing its surveillance and seizure operations at the border based on their First Amendment-protected activity.

### Third Claim

### Violation of the Privacy Act, 5 U.S.C. § 552a(a)-(l)

### (All Plaintiffs Against Defendants United States Customs and Border Protection, United States Immigrations and Customs Enforcement, and Federal Bureau of Investigation)

169.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

170.   Defendants collected and maintained records describing private and protected information about Plaintiffs, including how Plaintiffs exercised their First Amendment rights, in violation of 5 U.S.C. § 552a(e)(7). Collection and maintenance of these records is not expressly authorized by statute, not authorized by Plaintiffs, and is neither pertinent to nor within the scope of an authorized law enforcement activity.

171.   On April 3, 2019, Plaintiff Alex Mensing submitted letters to the FBI, CBP,

1    and ICE requesting that the agencies disclose all records they maintained about him in

2    relation to Defendants' surveillance scheme described above. The letter also requests

3    "that all such records be immediately expunged or amended by April 26, 2019 to omit all

4    references to him, identifying characteristics, and/or his First Amendment-protected

5    activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2)." To date, the

6    agencies have failed to provide Mr. Mensing with these records, or otherwise to respond

7    to his request for expungement.

8         172.    On April 3, 2019, Plaintiff Jeff Valenzuela submitted letters to the FBI,

9    CBP, and ICE requesting that the agencies disclose all records they maintained about him

10   in relation to Defendants' surveillance scheme described above. The letter also requests

11   "that all such records be immediately expunged or amended by April 26, 2019 to omit all

12   references to him, identifying characteristics, and/or his First Amendment-protected

13   activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2)." To date, the

14   agencies have failed to provide Mr. Valenzuela with these records, or otherwise to

15   respond to his request for expungement.

16        173.    On October 9, 2019, Plaintiff Ana Adlerstein submitted letters to the FBI,

17   CBP, and ICE requesting all records collected and maintained by the agencies as part of

18   their border surveillance and policing programs "be immediately expunged or amended

19   to omit all references to her, identifying characteristics, and/or her First Amendment-

20   protected activities, pursuant to 5 U.S.C. §§ 552a(e)(1), (e)(5), (e)(7), and (d)(2)." To

21   date, none of the agencies have responded to Ms. Adlerstein's requests or amended or

22   expunged any records about her.

23        174.    Defendants have therefore failed to disclose records as required by Section

24   552a(d)(1) or expunge or amend the records as required by Sections 552a(d)(2), (e)(1),

25   (e)(5), or (e)(7).  These records are not exempt from disclosure, amendment, or

26   expungement pursuant to Sections 552a(j)-(k) or any other applicable law.

27        175.    As a result of the Agency Defendants' failure to respond to Plaintiffs'

28   requests for access and amendment of their records, Plaintiffs suffered actual damages in

1    the form of pecuniary losses.

2        176.   Due to the records illegally maintained by Defendants of Plaintiff Alex

3    Mensing in violation of the Privacy Act, Mr. Mensing was unable to return to the United

4    States for a significant period of time without fear of detention, interrogation, and referral

5    to secondary inspection. The existence of these records resulted in alerts placed on Mr.

6    Mensing that caused Defendants to refer him to secondary inspection for further

7    detention, search, and interrogation every time he crossed into the United States. The fear

8    of these repeated searches and seizures—and the delays engendered by them—prevented

9    him from returning to the United States to secure employment (Mr. Mensing lacks legal

10   authorization to work in Mexico) for a period of seven months, between January and

11   September 2019. During these seven months, Mr. Mensing sought employment but could

12   not secure it in part as a result of Defendants' violations of the Privacy Act. When he did

13   begin returning to the United States in September 2019, Mr. Mensing's constant referrals

14   to secondary detention made his employment search difficult, causing further pecuniary

15   losses. As a resident of Tijuana, he needed to cross into the United States daily for work,

16   but could not assure an employer that on any given day he would not be significantly

17   delayed in his commute, nor could he ensure the employer that Defendants' scrutiny of

18   him would not impair the employer's work. Mr. Mensing estimates losses over $25,000

19   to date on account of his inability to secure full-time employment.

20       177.   As a result of the records illegally maintained by Defendants of Plaintiff

21   Ana Adlerstein, Ms. Adlerstein abandoned her nascent plans to develop a legal and

22   advocacy clinic in Sonoyta, Mexico to assist migrants seeking asylum in the United

23   States. The information collected and maintained by Defendants in violation of the

24   Privacy Act—including records identifying her as an illegal alien smuggler—prevented

25   her from developing the relationships with CBP necessary to facilitate creation of the

26   project, inhibited her ability to lead the project safely to support migrants whom

27   Defendants would suspect of being smuggled by her, and prevented other legal nonprofits

28   from taking an interest in sponsoring her program. Ms. Adlerstein lost her ability to work

1   on this non-profit project, and the associated employment that would likely have resulted

2   from it, as a result of Defendants' unlawful maintenance of records concerning her

3   associational and speech activity. Ms. Adlerstein estimates losses over $25,000 to date on

4   account of her inability to develop this legal support program, for which she would have

5   been employed.

6       178.   Similarly, Plaintiff Jeff Valenzuela suffered actual losses due to

7   Defendants' maintenance of records about him in violation of the Privacy Act. The

8   existence of these records resulted in alerts placed on Mr. Valenzuela that caused

9   Defendants to refer him to secondary inspection for further intrusive seizures, including

10  detention, search, and interrogation, in December 2018 and January 2019. In at least two

11  of these instances, Defendants conducted unwarranted searches of his mobile device,

12  including by reviewing his emails and querying his email provider for more emails. As a

13  result of these searches, Mr. Valenzuela feared subsequent searches of his mobile device

14  when crossing the border, as his device contained personal and private information.

15  Following these intrusive seizures, Mr. Valenzuela purchased a new primary mobile

16  phone for fear that his existing device had been compromised. Mr. Valenzuela also

17  acquired another mobile phone on a second line for use when he crossed the border, to

18  ensure that the private information on his primary device would not be compromised by

19  Defendants. In total, Mr. Valenzuela spent over $1,500 to remedy the detentions caused

20  by Defendants' violations of the Privacy Act.

21      179.   Plaintiffs are therefore entitled to disclosure, amendment, or expungement

22  of these records, as well as compensatory damages, pursuant to the Privacy Act.

23

24                          **PRAYER FOR RELIEF**

25      180.   Plaintiffs respectfully request that the Court grant the following relief:

26          a.   Issue an injunction ordering Defendants, their subordinates, agents,

27              employees, and all others acting in concert with them to cease their

28              suspicionless detentions, arrests, interrogations, and physical

restraints of Plaintiffs at the border for purposes unrelated to the border search exception to the Fourth Amendment, including in circumstances where Defendants lack any reasonable, articulable suspicion of border-related wrongdoing (i.e. customs violations, human trafficking, or contraband smuggling).

b.   Issue an injunction ordering that all information about Plaintiffs contained in records maintained or possessed by Defendants, their subordinates, agents, employees, and all others acting in concert with them and which was gathered during any unlawful detention or arrest be expunged.

c.   Issue an injunction ordering that all records collected and maintained about Plaintiffs in violation of the Privacy Act, 5 U.S.C. § 552a, and any information derived from that unlawfully obtained or maintained information, that is maintained or possessed by Defendants, their subordinates, agents, employees, and all others acting in concert with them, be expunged.

d.   Issue an injunction ordering Defendants, their subordinates, agents, employees, and all others acting in concert with them to cease investigations into and surveillance, detention, and interrogation of Plaintiffs based on their First Amendment-protected activity without suspicion or evidence of criminal activity.

e.   Enter a judgment declaring unlawful under the First and Fourth Amendments to the United States Constitution and the Privacy Act, 5 U.S.C. § 552a, Defendants' collection and maintenance of records concerning Plaintiffs' private and First Amendment-protected activities, Defendants' ongoing investigation and surveillance of Plaintiffs based on First Amendment-protected activity, and Defendants' searches and seizures of Plaintiffs at the border.

1        f.      Award Plaintiffs compensatory damages pursuant to the Privacy Act

2  in an amount to be proven at trial.

3        g.      Award Plaintiffs reasonable attorneys' fees and costs; and

4        h.      Grant any other relief that this Court may deem proper and just.

5

6  Dated:  October 26, 2020      Respectfully Submitted,

7  ACLU FOUNDATION OF SOUTHERN
      CALIFORNIA

8  KIRKLAND & ELLIS LLP

9  ACLU FOUNDATION OF ARIZONA

10

11  By:  _/s/ Mohammad Tajsar_____

12  Mohammad Tajsar
   Counsel for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28